STATE of Alaska, Appellant,

v.

ALASKA CONTINENTAL DEVELOP-
MENT CORPORATION and Alaska
General Properties, Inc., Appellees.

ALASKA CONTINENTAL DEVELOP-
MENT CORPORATION and Alaska
General Properties, Inc., Cross-Appel-
lants,

v.

STATE of Alaska, Cross-Appellee.

Nos. 4121, 4122.

Supreme Court of Alaska.

Dec. 31, 1980.

William R. Satterberg, Jr., and Gary W. Vancil, Asst. Attys. Gen., Fairbanks, and Avrum M. Gross, Atty. Gen., Juneau, for appellant and cross-appellee.

H. Bixler Whiting, Whiting & Rosie, Fairbanks, for appellees and cross-appellants.

Before RABINOWITZ, C. J., and CONNOR, BURKE and MATTHEWS, JJ.

## OPINION

RABINOWITZ, Chief Justice.

This is an appeal from what began as two eminent domain proceedings in Fairbanks. After separate master's hearings, the cases were consolidated in the superior court and heard in a non-jury trial. Portions of two tracts owned by the appellees, parcels four and seven, were taken for construction of the Parks Highway between Airport Road and Chena Pump Road. Another portion of one of these tracts, parcel one, was taken for the extension of Geist Road to its present intersection with the Parks Highway and Chena Pump Road.*

Parcels four and seven, about five and one-half and thirteen and one-half acres in size, respectively, were condemned in the spring of 1973. Parcel one, eight-tenths of an acre in size, was condemned in the spring of 1974.[1] In January 1974, the permit for construction of the pipeline to Prudhoe Bay was issued after several years delay. Thus, the times of taking occurred at the end of an economically "flat" period of few real estate sales to which the subject takings could be compared for valuation purposes.

The impact of the highway projects themselves on the value of the subject par-

---

* See Appendix "A" for a map of the subject parcels.

1. On April 6, 1973, the state filed a complaint which led to a declaration of taking for parcels four and seven. A complaint leading to a declaration of taking for parcel one was filed on March 29, 1974. The state's initial tender for

parcels four and seven was $89,000, and for parcel one, $22,425. At the master's hearings, just compensation for parcels four and seven was determined to be $227,500, and for parcel one, $18,000. The state appealed the master's award for parcels four and seven; the landowners appealed the award for parcel one.

cels was significant. The extension of Geist and its intersection with the Parks Highway near the northwest corners of parcels four and one greatly increased access and therefore commercial and higher-density residential use potential for all three parcels, although parcel seven already had access from Loftus Road.

The parties disagreed over the following: the highest-use potential of the sites prior to the actual construction of either highway, the availability of access to the sites, whether utility assessments were prepaid for the taken portions, the feasibility of the owners themselves constructing access roads to parcels four and one, whether the Geist extension and Parks Highway were separate projects, and the degree to which value attributable to planned future public improvements can be included in a determination of just compensation. The estimates of just compensation submitted in the several appraisals performed for the parties reflect these differences and the uncertainty in the economy at the time of the taking. The appraisals submitted by the landowners were substantially higher than those submitted by the state, and there was a wide variance among all of the appraisals in evidence.[2]

2. The following formal appraisals were admitted as evidence:

| Appraiser | Award | Highest Use | Damage to Remainder |
|---|---|---|---|
| | | Parcel Four | (5.387 acres taken) |
| | | State | |
| King | 10,750 | single family residential | none |
| Wakeland | 24,000 | moderate density residential | none |
| Potts | 37,000 | low to medium density residential | none |
| | | Landowner | |
| Follett | 96,768 | multi-family residential | none |
| Boucher | 161,500 | part commercial, part multi-family residential | none |
| Yerkes | 187,353 | part commercial, part multi-family residential | none |
| | | Parcel Seven | (13.586 acres taken) |
| | | State | |
| King | 39,500 | single family residential | none |
| Wakeland | 65,000 | multi-family residential | 10,798 |
| Potts | 82,000 | low to medium density residential | 7,000 |
| | | Landowner | |
| Yerkes | 225,790 | multi-family residential | 22,000 |
| Boucher | 297,000 | multi-family residential | 25,000 |
| Follett | 302,000 | multi-family residential | 30,000 |

In its decision, the superior court found the highest and best use for parcel four to be part commercial and part multi-family residential, and awarded $96,768 as just compensation, or $18,000 per acre. For parcel seven, the court found the highest and best use to be multi-family residential, and awarded $233,790 or $15,000 per acre as just compensation, including $30,000 in damages to the remainder of the tract not taken for the project. The court found commercial development to be the highest and best use for parcel one, and awarded $20,000 or about $25,250 per acre, as just compensation. The state now appeals various aspects of the superior court's determination of just compensation for the tracts, the assessment of certain attorney's fees and costs against the state, and the rate awarded for post-judgment interest. The landowners cross-appeal the determination of just compensation for parcel one, and the rate awarded for pre-judgment interest. We affirm the judgment of the superior court, except for the award for certain costs and for post-judgment interest.

## I. Enhanced Value from the Highway Projects

The primary issue on appeal is whether the superior court erred in considering evidence of value added to the parcels by the expected construction of the two roads.

The appraisals submitted by the landowner for parcel four mention the planned extension of Geist Road as a factor in determining the highest and best use of the taken land. The same is true for two of the three appraisals submitted by the landowner for parcel seven. One of the landowner appraisals for parcel one mentions that the access ramp built as part of the new Parks Highway at its intersection with Chena Pump Road creates access to the property at its northwest corner, and goes on to state that the parcel's highest and best use at the time of the taking would be for "speculative investment" in anticipation of the "long-discussed" Geist Road extension for which the parcel was ultimately taken. This appraisal concludes that the highest and best use of parcel one would be commercial if the Geist Road extension were connected to the Parks Highway at the Chena Pump Road intersection as planned, and for multi-family residential use if the extension were not completed.[3] Another of the landowner appraisals concluded that the "ultimate completion of Geist Road" would lead to some commercial development on parcel one in addition to the multi-family residential development projected regardless of the Geist extension.

The superior court observed in its decision that the ready availability of utilities to the

| Parcel One | | (.792 acres taken) |
| --- | --- | --- |
| State | | |
| Dirkson | 13,450 | multi-family residential | none |
| Landowner | | |
| McCracken | 22,425 | multi-family residential | none |
| Boucher | 29,300 | partly commercial, partly multi-family residential | none |
| Follett | 34,500 | commercial | none |

McCracken's appraisal was performed for the highway department, but his value testimony was submitted into evidence by the landowner.

3. The parties disputed the feasibility and cost to the owners themselves of constructing a road suitable to support commercial development of the tract. None of the appraisals submitted by the landowners, however, deducted from the value of the property the cost of extending paved access from the old terminus of Geist to its current intersection with the Parks Highway, a distance of over one-half mile. The superior court included no mention of such an alternative in its findings or opinion. It is our conclusion therefore that no value of the property attributable to such potential privately developed commercial access was incorporated in the superior court's determination of just compensation for the tracts.

subject properties was more significant than access in increasing the value of the parcels. However, the court noted that the owners were entitled to receive compensation for parcels four and seven attributable to the planned extension of Geist Road because it was a separate project from the Parks Highway construction for which these parcels were taken. The court concluded that value attributable to the Parks Highway could be considered in determining just compensation for parcel one, taken for the Geist extension, for the same reason. The superior court also concluded that just compensation for each parcel could include value from the expected construction of the Geist extension at least until 1968, because prior to that time no route which would take any of the subject property had been chosen for the project. The state challenges these findings, arguing that although the projects were designated as separate by the highway department, they were part of the same overall plan to restructure traffic flow through the area, and that the superior court erroneously included value from the projects attributable to years since 1968 in its awards.

■ In Alaska, inclusion of value enhancement attributable to the project for which the property is being taken is generally prohibited in determining condemnation awards. AS 34.60.120(3) provides in pertinent part:

A decrease or increase in the fair market value of real property before the date of valuation caused by the public improvement for which the property is acquired or by the likelihood that the property would be acquired for the improvement, ... will be disregarded in determining the compensation for the property.

This general rule is in accordance with the requirement in the Alaska and United States Constitutions that just compensation be paid for private property taken for public use,[4] since it only prevents a landowner from receiving more value for his property

than he would if the government had no use for his land and it was purchased by a private buyer. However, this rule does not preclude an owner from receiving compensation for value added to the property by an unrelated public project which took no portion of the tract involved. As stated in 4 J. Sackman, *Nichols' The Law of Eminent Domain* § 12.3151(3), at 12–470 (rev. 3d ed. 1979):

[I]t has been held that, where property is enhanced in value by reason of a public project and subsequently the property is taken for another unrelated project the owner is entitled to recover the enhanced value brought about by the first project.

*See United States ex rel. TVA v. 137 Acres of Land*, 406 F.2d 1283 (6th Cir. 1969).

■ As previously mentioned, the superior court concluded in its findings that the Geist Road extension and the Parks Highway were two separate projects for the purposes of determining just compensation. We agree that this determination is one of fact, which on review we may reverse only if it is "clearly erroneous."[5] Our conclusion is supported by precedent holding that a determination in a particular case of whether a parcel is within the original scope of a public project subsequently enlarged to require the taking of the tract is a question for the trier of fact. *John L. Roper Lumber Co. v. United States*, 150 F.2d 329, 331 (4th Cir. 1945); *cf. United States v. Certain Lands Located in the Townships of Raritan and Woodbridge*, 144 F.Supp. 206, 213–14 (D.N.J.1956), *modified on other grounds*, 246 F.2d 823 (3d Cir. 1957). On the other hand, the conclusion that determining the scope of a project is a question of law reached in *United States v. Reynolds*, 397 U.S. 14, 20, 90 S.Ct. 803, 807, 25 L.Ed.2d 12, 18 (1970), and *Wardy v. United States*, 402 F.2d 762, 763 (5th Cir. 1968), is premised on Federal Rule of Civil Procedure 71A(h), which reserves all legal *and* factual questions, except the determination of "just

---

4. U.S.Const. amend. V; Alaska Const. art. I, § 18.

5. Alaska R.Civ.P. 52(a); *Alaska Foods, Inc. v. American Mfr's Mut. Ins. Co.*, 482 P.2d 842, 843 (Alaska 1971).

compensation" in a jury trial, to the trial judge. There is no comparable rule governing eminent domain litigation in Alaska. In the case at bar, the trial judge acted as fact finder in lieu of a jury. The *Wardy* opinion characterizes the issue as a "legal" question, but does so incorrectly in our opinion. Determining the scope of a single project or the relationship between projects involves a determination from documents, testimony, and other evidence of the government's intent at a particular time.

■■■ Under the "clearly erroneous" standard of review, we will not reverse a trial court's finding of fact unless "convinced, in a definite and firm way, that a mistake has been committed." *Alaska Foods, Inc. v. American Manufacturer's Mutual Insurance Co.*, 482 P.2d 842, 848 (Alaska 1971). We conclude there was adequate evidence in the record here to support the superior court's findings as to separate projects. The projects were designated by the highway department under different numbers, one as a primary road and the other as a part of the secondary road system.[6] The condemnation proceedings for the parcels taken for the Parks Highway began a year prior to that for the parcel taken for the Geist extension, as a separate case, despite the fact that one parcel for the Parks Highway and the one for the Geist project were being taken from the same tract of land. Further the state's appraiser for parcel one considered the projects to be separate for the purposes of valuation, considering the Parks Highway as a given condition in appraising that parcel for the Geist extension taking. Another witness from the highway department also stated that the projects were separate. While the two roads both contributed to diverting traffic from the University area and met at an intersection, the state did not show that constructing either project was dependent upon the completion of the other. The superior court correctly observed that the burden of proving that the projects should be considered as one for valuation purposes was on the state, the party asserting the claim. *United States ex rel. TVA v. 137 Acres of Land*, 406 F.2d 1283, 1287 (6th Cir. 1969).

■ We turn next to the question of whether it was proper to consider value due to the expectancy of the Geist Road extension prior to the choice of the route which would take parcel one in determining just compensation for parcels four and seven. The appraisals for these parcels taken for the Parks Highway only mention value from the Geist extension in their analysis.[7] Two of the landowner appraisals for parcel one, taken for the Geist Road extension, also considered value from that project in determining compensation for that parcel. However, we agree with the superior court's conclusion that value resulting from the general knowledge that the project was

---

6. The state cites *Alsop v. State*, 586 P.2d 1236 (Alaska 1978), for the proposition that an overall plan's scope extends beyond the technical limits of a project. That case concerned a subsequent decrease in value to nearby lands from the elimination of access to the Seward Highway, due to a later elimination of an intersection that had actually been constructed according to the original plan for that highway. Furthermore, the complaining parties had relied on the availability of access created by the original intersection in settling a condemnation award for the portion of land taken for the original intersection, and in developing their property for commercial use as well. This court held that upon proof of this reliance, the parties would be entitled to compensation for the elimination of the intersection as a separate taking, without reference to AS 34.60.120(3).

7. One of the appraisals for parcel four assigns the same per acre value for just compensation as was used in another appraisal, performed by the same appraiser for the landowner for a merger proposal at around the time of the taking. This latter merger appraisal listed as an assumption the existence of the Parks Highway—Geist Road intersection in figuring the value. However, the amount awarded by the court for parcel four was less than 60% of the figure for just compensation in this condemnation appraisal. All other appraisals submitted by the landowners for parcels four and seven refer only to the general expectancy of the Geist Road extension without regard to the Parks Highway. Thus, the state's argument that the higher values in the landowner appraisals for these tracts, and thus those in the court's judgment, were largely due to the intersection lacks support in the record.

planned was proper to consider up to the date the route was chosen that would take parcel one. The applicable exception to the general prohibition against awarding enhanced value from the project for which a parcel is taken is referred to in Nichols' treatise as the "indefinite location" rule:

> It frequently happens that the exact site of the projected improvement is not determined until the condemnation proceedings have been actually instituted, and that it is only known in a general way that it will be located in a certain neighborhood. In such case the anticipatory rise or fall of values may affect all land in the neighborhood, and it may be the fact that when a certain location is taken, the land acquired had on the day of the institution of proceedings a greater or lesser market value than it would have had if there had been no preliminary discussion of the improvement. If this modification of values is to be disregarded, an exception to the rule that market value is the test must be recognized. To allow a public agency to depress market values in a particular neighborhood by threatening to erect an offensive structure in its midst, and then to take advantage of this depression in paying for the land required, would be so abhorrent to the public sense of justice that it has never been seriously argued that it could be done. When, however, the situation is reversed, and the preliminary discussion has enhanced the value of the land in the neighborhood, the courts have not been inclined to create an exception to the general rule that market value at the time of the taking is the conclusive test, and have usually held that the owner is entitled to the benefit of the appreciation in value from the general expectation that the improvement for which it was taken would soon be constructed.

4 J. Sackman, *Nichols' The Law of Eminent Domain* § 12.3151(2), at 12–459 to 12–460 (rev. 3d ed. 1979) (footnotes omitted). This rule derives in part from language in *United States v. Miller*, 317 U.S. 369, 377, 63 S.Ct. 276, 281, 87 L.Ed. 336, 344, *reh. denied*, 318 U.S. 798, 63 S.Ct. 557, 87 L.Ed. 1162 (1942), which dealt with the enlargement of an existing project:

> The question then is whether the respondents' lands were probably within the scope of the project from the time the Government was committed to it. If they were not, but were merely adjacent lands, the subsequent enlargement of the project to include them ought not to deprive the respondents of the value added in the meantime by the proximity of the improvement.[8]

"Authority to Proceed" with the Geist Road project was given in 1964, which was authority to proceed with necessary preliminary studies leading to the selection of a preferred route. A 1962 Department of Highways Development plan showed a planned extension of Geist Road to the Nenana Highway, along a route which would not take any of the subject parcels. The route through parcel one was selected in 1968. Given these facts, we cannot conclude that the superior court's finding that parcel one was not properly within the scope of the Geist Road project until 1968 was "clearly erroneous."

■ If some of the appraisals considered by the superior court included value attributable to the period after 1968, as the state alleges, we conclude that any error in admitting that evidence was harmless.[9] The amount of just compensation awarded by the superior court for parcel one was less than the amount determined in an appraisal originally performed for the state which did

---

8. *See also United States v. Reynolds*, 397 U.S. 14, 21, 90 S.Ct. 803, 807, 25 L.Ed.2d 12, 18 (1970) (to be within the "scope of the project," the land need not be named or delineated in the original scheme, but a probable need for it must have become evident in the course of planning or original construction).

9. A legal error not based on a constitutional claim is harmless if it can be said with fair assurance, without stripping the erroneous action from the entire evidence, that the finder of fact was not substantially swayed or affected by the error. *Love v. State*, 457 P.2d 622, 630–31 (Alaska 1969).

not consider any value from the extension of Geist Road.[10] Furthermore, the award was considerably lower than the amount suggested in the other appraisals offered by the landowner.[11]

## II. Motion for Evidentiary Ruling and for Ruling of Law Prior to Trial

█ In a related argument, the state complains about the superior court's refusal to rule, prior to trial, generally on the admissibility of enhancement in value evidence, in order that both parties could apply the correct rule of law in preparing their appraisals. We hold that no error was committed.

The state originally moved, four months prior to trial, for an evidentiary ruling generally barring evidence of enhancement of value due to the proposed highway projects. The state later moved for a further evidentiary ruling to "clarify the extent of the 'project' in this case." The superior court denied these motions without prejudice, stating that the motions were premature and could be renewed at trial. The state then filed a "motion for ruling of law" requesting the court to "affirm the principles of condemnation" set forth in the state's memoranda accompanying the prior motions. The trial court denied this motion as premature, immediately prior to trial.

The basic defect in the state's argument is that it fails to recognize the difficulty the superior court would have had in fashioning the orders requested prior to hearing any evidence. The proposed evidentiary ruling would have barred "all evidence of value, including expert testimony of [a] valuation witness, which incorporates such pre-condemnation enhancement in value of the land as was attributable to the proposed project," and would have ordered that the "proposed project" included both the Geist extension and the Parks Highway. The state requested the court to make this broad exclusionary ruling and these findings of fact without the benefit of any affidavits or other authenticated facts showing why the two projects should be considered as one, save for a single, brief affidavit from the highway department regional road design engineer, stating that the Geist extension had been considered as a connector to the Parks Highway since at least 1968.

The request for a ruling of law referred the superior court back generally to the legal memoranda in support of the motion for an evidentiary ruling. These memoranda covered a wide range of eminent domain law pertaining to enhancement of value from public projects. Again, no substantiation or detailed presentation of the evidence expected to be presented was included so that the superior court could narrow its consideration of the applicable law to the facts of the case at hand.

The state has not persuaded us that the court should have departed from normal practice and ruled on the admissibility of evidence prior to the time it was offered at trial, when its nature and the purpose for which it is offered could be ascertained. *See generally* C. McCormick, *Law of Evidence* § 51, at 109–12 (2d ed. 1972). The cases which the state cites in support of its argument are not supportive. *State v. Leach*, 516 P.2d 1383 (Alaska 1973), and *Dash v. State*, 491 P.2d 1069 (Alaska 1971), call for a liberal approach to the discovery and admission of valuation evidence in condemnation cases. In *Ketchikan Cold Storage Co. v. State*, 491 P.2d 143, 146–48 (Alaska 1971), we vacated an establishment-preclusion order in a condemnation case which would have prevented the landowner from introducing evidence pertaining to the value of his property, much as the proposed order in the case at bar would have. In *Babinec v. State*, 512 P.2d 563, 568–69

---

**10.** The amount determined for just compensation in this appraisal equalled the amount originally offered by the state to the landowner for parcel one.

**11.** When the state moved to strike one appraisal of parcel one, because it considered enhancement in value from the Geist Road extension, the court denied the motion, stating that that fact went to the weight, not the relevancy, of the evidence.

(Alaska 1973), this court held in error a trial court instruction which determined that the properties in question comprised a single unsubdivided parcel for the purposes of valuation, where there was sufficient evidence offered at trial to justify submitting to the jury whether the properties should be valued as more than one parcel.

While a clarification prior to trial of the law which the court intended to follow in considering the admissibility of valuation evidence may have assisted in the preparation of appraisals, the state has not presented a convincing argument that it was entitled to a ruling in a broad area of eminent domain law, without the superior court having the benefit of knowing the details of the factual context over which the parties were in dispute.

### III. Whether the Judgment for Parcels Four and Seven was Against the Substantial Weight of the Evidence [12]

The state admits that it bears a heavy burden in contending that the trial court erred in its determination of just compensation for the above parcels. The burden is especially heavy with respect to condemnation proceedings, where considerable latitude must be accorded the trier of fact due to the complicated nature of property appraisals.[13] The length of the record and the disagreement among different appraisers over the value of the properties in this case bear this out. The state nevertheless proceeds with two corollary arguments as to why the judgment was against the substantial weight of the evidence, neither of which is persuasive.

The state first of all complains that certain expert witnesses were allowed to remain in the courtroom and listen to testimony by other witnesses, despite the state's request that the court invoke the exclusionary rule.[14] The state goes on to assert that the presence of these witnesses in the courtroom had a tangible prejudicial effect upon the state's case, in that one of these witnesses, Mr. McCracken, persuaded the court to adopt his opinion as to prepaid assessments for utilities while not under oath, despite the court's ruling that his appraisal testimony would not be considered as evidence. The state also alleges prejudice from the court's reliance in its judgment upon another expert, Richard Follett, who allegedly changed his testimony in the course of the trial after listening to the testimony of other expert witnesses.

The state, however, waived any objection it had to these experts being

---

**12.** The state contends that the judgment as to these parcels is "excessive as a matter of law" as well, but never argues or defines this point further. The state does not argue that the judgment for parcel one was against the substantial weight of the evidence.

**13.** In *Babinec v. State*, 512 P.2d 563, 570 (Alaska 1973), we stated:

> The central objective in eminent domain proceedings such as the one before us is the determination of just compensation for the property condemned. Achievement of this goal must not be deterred by rigid evidentiary rules or technical formulas. As the Supreme Court of Hawaii observed in *Territory of Hawaii v. Adelmeyer* [45 Haw. 144], 363 P.2d 979, 985 (1961): '... [I]n partial taking cases, no rigid rules can be prescribed. The facts and circumstances of each case must be considered to determine the applicable formula.... "The rules for determining value of land taken by the condemnation cannot, from the nature of the case, be inflexible. In each case just compensation is the goal; and where rigid application of even a settled rule will produce injustice it must be departed from so far as made necessary by the circumstances of the case...."' [citation omitted] [footnote integrated into text]

*See also Ketchikan Cold Storage Co. v. State*, 491 P.2d 143, 151 (Alaska 1971), where we stated:

> The appraisal of property is not an exact science. It requires a complex balancing of the various principles and techniques which are utilized in reaching the final estimate of value.

**14.** Alaska R.Civ.P. 43(g)(3) provided:

> *Exclusion of Witnesses from Courtroom.* At the request of any party, the court may exclude from the courtroom any witness of the adverse party not at the time under examination, so that he may not hear the testimony of other witnesses.

Although Civil Rule 43 was in effect at the time of the trial, this rule has since been rescinded by Supreme Court Order 366, effective August 1, 1979.

present in the courtroom by explicitly agreeing to that procedure at trial.[15] Furthermore, if any error occurred, which we doubt given the discretion accorded the trial court in such matters,[16] it was harmless in our opinion. The state has not shown that McCracken's statements to the court or Follett's change in testimony affected the final judgment as to parcels four and seven in any prejudicial way. McCracken's statements to the court were to the effect that transfer of prepaid utility assessments from the taken parcels to other parcels did not eliminate all the value to the taken parcels from the nearby availability of sewer and other utilities, but only reduced the value of the parcels by the cost of installing the utilities.[17] The state admits that utilities were available to all of the parcels, and that the court did not consider value attributable to prepaid assessments in its final opinion. It is the lack of weight given to access value in the court's conclusions which the state criticizes, but the state never relates this criticism to McCracken's discussion with the court over utilities. As to Follett, he admitted at trial that he had not considered damage to parcel seven from loss of river frontage and said that if he were doing it over, he would change his apprais-

al, without specifying a greater estimate. Follett's testimony indicates that his opinion may have changed due to hearing other testimony at trial. The court accepted Follett's computation for value per acre for parcel four and his estimate for the damage to the remainder of parcel seven in its opinion. But these figures were contained in Follett's written appraisal prepared prior to any change in his testimony at trial.[18]

The state's second argument is that the court failed to consider letters of valuation by a witness named Bruce Street, a local appraiser. Street had been hired by the landowners to substantiate values of lands which included the subject parcels, for the purposes of a proposed stock transfer between the landowner corporations. These letters of valuation state that they are not to be considered formal appraisals, but are determinations of fair market value "based on the best information available." They were prepared in the spring of 1972, about a year prior to the date of taking for parcels four and seven. They appear to consider, to varying degrees, value enhancement from the Parks Highway and Geist extension projects, and value the lands at between $6,000 and $8,000 per acre. These

15. This is clearly revealed by the following exchange from the transcript, which immediately followed the state's request for invocation of the exclusionary rule:

THE COURT: "As far as I am concerned, anyone that's testifying as an expert witness in a case can come in and listen to other witnesses testify. Now, I'll waive the exclusionary rule to that for everyone. That's not talking about the facts in the case, you're going to have to get hypothetical opinions and say, 'Here's what witness so-and-so said and I want to know what you think about that'. They might as well come in and hear what Mr. so-and-so testified, save everybody time."
MR. SATTERBERG [for the state]: "Okay, we can do that then."
THE COURT: "Any expert witness can come in and hear the testimony of any other witness—expert witness throughout the trial."
MR. WHITING [for the landowners]: "Okay."
MR. SATTERBERG: "Okay."

16. *See generally* Annot., 85 A.L.R.2d 478 (1962).

17. McCracken was stricken as an appraisal witness for parcels four and seven, because his appraisals for these parcels had not been prepared in time for the state to have an opportunity for discovery concerning their content. Prior to the discussion between McCracken and the court to which the state objects, however, the court had ruled that McCracken could testify as to any matters besides the appraisal of the above parcels.

18. Follett also appeared to change his opinion of highest and best use for parcel one at trial, from "speculative investment" to "commercial," on the basis that in his written appraisal he had not considered the possibility that the owners themselves could extend Geist Road to create commercial access to the parcel. Like Follett, the court concluded in its opinion that parcel one's highest and best use at the time of taking was for commercial development. However, the court adopted a value for just compensation for the parcel of $20,000, far less than the figure of $34,500 contained in Follett's written appraisal, a figure which he did not change at trial.

values are approximately the same as the highest appraisals submitted by the state for parcels four and seven. Mr. Street also testified at trial that the letters were to justify values being claimed by the landowners in this stock transaction, and that the valuations did not ignore the influence of the planned projects, but also did not consider them as substantial factors in creating the value of the land. Since the stock transfer eventually took place, the state characterizes Street's opinions as evidence of the value of the parcels in a market transaction.

The state contends that the court apparently "totally ignored" Street's opinion in reaching its final judgment. But the state provides no basis for this conclusion other than the divergence in Street's values from other appraisals performed for the landowners. Besides the condemnation appraisals and other evidence which supports the superior court's judgment, appraisals conducted in the fall of 1973 for another proposed stock exchange in which the landowner corporations were involved were submitted in evidence. These appraisals assign values in the range of $25,000–$35,000 per acre for the subject lands, considerably higher than the values awarded by the court. We therefore cannot agree with the state that the superior court failed to give any weight to the evidence from Street.

■ Reviewing the totality of the evidence before the superior court, we conclude that the judgment as to parcels four and seven is supported by the substantial weight of the evidence.[19] Of the appraisals

---

19. The following evidence also supports a conclusion that the land taken was worth more than the values arrived at in the state's appraisals:

a. Location. The land abuts the south property line of the University of Alaska and lies between the development of the University West subdivision and the University. It lies between the end of Geist Road (prior to extension) and the point where the Chena Pump and Chena Ridge Roads meet and connect with the west entrance to the University and the Nenana Highway (prior to the Parks Highway project). It is centrally located between the developing areas of Chena Ridge, Chena Pump, College Road, and the Airport.

b. Testimony by one of the original purchasers of the land that in the early 1960's the owners planned for commercial and multi-family residential use, in anticipation of a Geist Road extension to the Nenana Highway and the general growth in the areas. Two other officers of the landowner corporations also testified that the property closest to the University was being held for commercial development and the remainder for multi-family residential use in the early 1970's. A 1969 architectural drawing prepared for the landowners shows planned development of parcels one and four as commercial, and parcel seven as multi-residential. A planning document prepared by the state highway department in 1968 projects that parcels one and four would be used for a shopping center by 1984. A 1964 highway department document gives "authority to proceed" for the extension of Geist Road to the proposed site of the Parks Highway. Another highway department document prepared and released to the public in 1962 also shows this project.

c. Other testimony regarding the development potential of the property. A Fairbanks real estate consultant testified that the northern portions of parcels four and one definitely had commercial potential in the early 1970's due to the number of people in the area and lack of commercial enterprises. A prominent developer of commercial property agreed with this evaluation.

d. Importance of utilities. The superior court stated in its opinion that availability of utilities is more significant in valuation than the location of highways, since if sewer and water are not available, the property is limited to low-density residential development. In its opinion, the court also criticized the state's appraisals for arriving at a value too low to reflect the ready availability of utilities to the property. The court received direct testimony from another of the landowners' appraisers, Yerkes, that utilities were an extremely important consideration, as evidenced by the contrast between two existing subdivisions in the neighborhood. One, built prior to availability of utilities, had low-density development, and the other, built with utilities available, was developed much more densely.

e. Sale by the landowners of 33 acres of land adjoining parcels four and seven to Teal Development Corporation prior to the condemnation. This sale was used by the state's appraisers as a comparable sale. It was sold in exchange for a price of $5,000 per acre, plus an option to purchase a four acre portion next to parcels four and one at the planned intersection of Geist and the Parks Highway. One of the landowners testified that the effective price paid for the total acreage approximated $15,000 per acre, because the option on the parcel at the future intersection was for a price much lower than its value as a commercial piece of ground. He further testified that the sale was

and testimony of the expert appraisal witnesses presented by the landowners, the court chose the lowest appraisal submitted for each parcel.

### IV. Whether the Award for Parcel One Was Contrary to the Evidence

The landowners raise this issue on cross-appeal. Their motion to reconsider the monetary award for parcel one under Civil Rule 77 was denied by the superior court. The landowners complain that the monetary award of $20,000 for this parcel is inconsistent with the court's finding of fact that the highest and best use for the parcel was commercial, since the only evidence submitted which appraised the property as purely commercial placed its value at a much higher figure.[20]

We find no error in the denial of the motion. A trial court's decision on a motion to reconsider its judgment will be reversed on appeal for an abuse of discretion, only if this court is left with a definite and firm conviction from the whole record that the trial judge has made a mistake. *Brown v. State*, 563 P.2d 275, 279 (Alaska 1977). The superior court's award for parcel one is equivalent to about $25,250 per acre. This is over $7,000 per acre higher than its award for parcel four (taken from the same tract), which the court concluded had some commercial as well as multi-family residential potential. It is over $10,000 per acre greater than the award for parcel seven, which the court concluded was suitable for multi-family residential use alone. The court noted in its opinion the wide divergence between the appraisals submitted by the state and those submitted by the landowners:

> There is considerable variance in the opinions of the appraisers. The opinions on Parcel 1 range from Mr. Dirksen's $13,455.00 to Mr. Follett's $35,000.00. Mr. King is also low on Parcel 4, estimating a value of $10,750.00, while Mr. Yerkes concludes that $187,353.00 is fair. The ranges on Parcel 7 run from $39,500.00 (King) to $302,000.00 (Follett). The other values fall somewhere in between, with the appraisers who testified on behalf of the State generally being low, and the appraisers who testified on behalf of the Defendants generally being high.

The court stated that it made its award for parcel one after "[c]onsidering all the testimony which has been presented with regard to Parcel 1." That the court accepted one appraiser's opinion regarding highest and best use, yet rejected his estimate of value for that use, or that no value equivalent to that awarded by the court was contained in the testimony of any single witness, does not convince us that the award was clearly mistaken. The testimony and other evidence in this case are sufficiently complex and contradictory to allow the trial court to balance and weigh all the evidence to reach

made to Teal because Teal's development of the sold tract would increase the value of the remaining land, consisting of parcels four and seven. This price did not include any pre-paid assessments for utilities. The $15,000 per acre figure is identical to what the court awarded for parcel seven and $3,000 per acre less than its award for parcel four.

f. Discredit of at least one of the state's appraisals. Evidence was introduced that the King appraisal, the lowest valuation submitted by the state, was considered inferior by the highway department's reviewers.

20. The only certified appraiser who concluded the parcel's highest and best use at the time of the taking was commercial was Richard Follett, who valued the parcel at $34,500. The state's single appraisal witness on this parcel concluded that its highest and best use was multi-family residential, and arrived at a valuation of $13,450 for just compensation. McCracken performed an appraisal of parcel one originally for the state, but it was introduced into evidence by the landowners. This appraisal also concluded the parcel's highest and best use was multi-family residential, but valued the taking at $22,425. McCracken testified that his valuation would have been equivalent to about $86,250 if the Geist Road extension were considered a given fact. Another appraiser for the landowners considered highest and best use to be a mixture of commercial and multi-family residential development and valued the taking at $29,300. The only other witness stating an opinion on the value of the property was Paul Gavora, a developer, who testified the land was worth an amount per square foot equal to an award of about $35,000 for the taken portion.

its judgment rather than choosing between accepting and rejecting the different value figures contained in each appraisal to arrive at an award.

## V. New Trial on the Basis of Newly Discovered Evidence of Fraud

Six months after final judgment was entered, the state filed a motion for relief from judgment and for a new trial on the grounds of newly discovered evidence, pursuant to Civil Rule 60(b).[21] This motion was denied.

■ The newly discovered evidence concerned Richard Follett, one of the landowners' appraisers whose testimony the trial court had in part relied upon in its judgment. The evidence consisted of Follett's testimony in a subsequent case, approximately one month after the final judgment in this case, in which Follett admitted to selecting comparable sales in the high end of the market spectrum in arriving at a value for just compensation in his condemnation appraisals, because the landowner was not a willing seller in such a transaction. Such an approach to condemnation appraisals is contrary to the law in Alaska that "fair market value," or the price a

willing buyer would pay a willing seller for property, is the appropriate measure of "just compensation." *State v. 7.026 Acres*, 466 P.2d 364, 365 (Alaska 1970). The state argues that this evidence shows that Follett committed "fraud on the court" under Civil Rule 60(b) because he must also have ignored lower-priced comparable sales in his appraisals for this case, yet certified in his appraisals that they represented "market value" and reflected no personal bias. We disagree. The alleged fraud by Follett cannot be characterized as "fraud upon the court." Even if Follett's conduct falls within the guidelines of statutory perjury as the state contends, where perjury by a witness is unassisted by the party in interest or by counsel, the general rule is that the misconduct does not amount to "fraud upon the court."[22] While perjury by a witness is always a cause for concern, we do not believe, even if we were to accept the state's argument that Follett committed perjury, that in this case it would rise to the level of "the most egregious conduct involving a corruption of the judicial process itself," that we have required for a finding of "fraud upon the court" in past cases. *Allen v. Bussell*, 558 P.2d 496, 500 (Alaska 1976).[23]

21. Alaska R.Civ.P. 60(b) provides:

*Mistakes—Inadvertence—Excusable Neglect—Newly Discovered Evidence—Fraud—Etc.* On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order, or proceeding for the following reasons:

(1) mistake, inadvertence, surprise or excusable neglect;

(2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b);

(3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party;

(4) the judgment is void;

(5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or

(6) any other reason justifying relief from the operation of the judgment.

The motion shall be made within a reasonable time, and for reasons (1), (2) and (3) not more than one year after the judgment, order

or proceeding was entered or taken. A motion under this subdivision (b) does not affect the finality of a judgment or suspend its operation. This rule does not limit the power of a court to entertain an independent action to relieve a party from a judgment, order or proceeding, or to grant relief to a defendant not personally served, or to set aside a judgment for fraud upon the court. Writs of coram nobis, coram vobis and audita querela are abolished, and the procedure for obtaining any relief from a judgment shall be by motion as prescribed in these rules or by an independent action.

22. *11 C. Wright & A. Miller, Federal Practice and Procedure § 2870, at 256–57* (1973); *see also H. K. Porter Co., Inc. v. Goodyear Tire & Rubber Co.*, 536 F.2d 1115, 1118 (6th Cir. 1976); *Lockwood v. Bowles*, 46 F.R.D. 625, 632–33 (D.D.C.1969).

23. In *Allen*, this court held where a written default judgment drafted by a party and counsel differed from the court's oral entry of default in that it named both plaintiffs rather than one as subject to the judgment, it did not necessarily constitute fraud upon the court. *Cf.*

We question whether the state's motion, as a motion based on Civil Rule 60(b)(2) or 60(b)(3), was timely. Civil Rule 60(b) requires that motions for relief from judgment based on newly discovered evidence or the fraud of an adverse party be made within a reasonable time, and not more than one year after judgment. Whether the state's five month delay in making it motion, after discovering the evidence, was "within a reasonable time" is questionable, since the state has offered no reason for the delay.[24]

■ Concerning motions for a new trial based on newly discovered evidence, the evidence must be such as would probably change the result of the trial. *National Bank of Alaska v. McHugh*, 416 P.2d 239, 244 (Alaska 1966). Evidence which merely impeaches a witness's testimony is not usually sufficient to warrant the grant of a new trial. *Id.* at 244–45. This court will not reverse the trial court's denial of a Civil Rule 60(b) motion unless the denial is shown to be an abuse of discretion. *Nordin Construction Co. v. City of Nome*, 489 P.2d 455, 472 (Alaska 1971).

■ In our opinion, the newly discovered evidence offered by the state in this case has no value beyond impeachment of Follett's testimony. Evidence that Follett relied only upon high comparable sales in his appraisals in another condemnation case does not prove that he slanted his appraisals in the case at bar. No evidence was developed in this case, by cross-examination or otherwise, that Follett selected and relied on certain comparisons to the exclusion of others in his appraisals. Follett's appraisals, like the other appraisals submitted by the landowner, incorporate comparable sales which are of higher value than several of those used by the state's appraisers, but this case is characterized by a lack of closely comparable sales to the subject property because of the uncertain market at the time of the taking.

Moreover, counsel could have cross-examined Follett pertaining to comparable sales. Follett could have been questioned as to whether he considered certain sales of a lower value. If he indicated that he had not considered those sales, inquiry could well have led to discovery of Follett's alleged theory of considering only higher appraisals. Thus, the matter that is now presented as grounds for a new trial could very likely have been discovered by effective cross-examination. Accordingly, it appears that the requirement of Alaska Rule of Civil Procedure 60(b)(2), that the newly discovered evidence could not have been discovered by due diligence in time to move for a new trial under Rule 59(b), has not been met.

■ The additional evidence was unlikely to change the result in this trial, even though it might have discredited Follett's testimony. The per acre figure for parcel four which the court adopted from Follett's

---

*Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238 [64 S.Ct. 997, 88 L.Ed. 1250] 88 L.Ed. 1250 (1944) (attorney wrote and had printed in a trade journal an article praising his client's device as a remarkable advance, under the name of an expert in the field. The attorney then used the fraudulent article to obtain a patent for his client and to defend it in court. The Supreme Court characterized this activity as a "deliberately planned and carefully executed scheme to defraud not only the Patent Office but the . . . [c]ourt . . . ." 322 U.S. at 245 [64 S.Ct. at 1000] 88 L.Ed. at 1255]; *Mallonee v. Grow*, 502 P.2d 432, 438–39 (Alaska 1972) (where party and counsel filed a writ of execution which overstated the amount due from a debtor and designated property subject to the execution which did not belong to the debtor, fraud upon the court was committed).

**24.** For motions under Civil Rule 60(b) based on a mistake of law, this court has interpreted "reasonable time" to mean within the time for taking an appeal, *i. e.*, 30 days from the entry of final judgment. *Pearson v. Bachner*, 503 P.2d 1401, 1402 (Alaska 1972) (two and one-half year delay); *Alaska Truck Transport, Inc. v. Berman Packing Co.*, 469 P.2d 697, 699–700 (Alaska 1970) (11 months delay). However, where perjury or some greater fraud is the basis for the motion, we believe a longer period within which to bring the motion may be in order, at least where the other party has not changed its position in reliance upon the order in the interim. The purpose of Civil Rule 60(b) is to strike a proper balance between bringing litigation to an end and correcting injustice. *Id.* at 699.

appraisal in its opinion was a little over half what was paid for the properties listed as comparable sales in that appraisal, and also less than the other appraisals submitted by the landowners. For parcel seven, the court adopted a per acre figure from another appraisal submitted by the landowner, $5,000 per acre lower than that of Follett's appraisal. The court accepted Follett's total figure of $30,000 for damages to the remainder of parcel seven, which was higher than other appraisals of that damage by several thousand dollars. As the landowners point out, however, the court's award covered damage both from loss of access and loss of river frontage, while Follett's appraisal figure only accounted for the loss of access. For parcel one, the court stated it relied on all the testimony presented, and awarded an amount less than two-thirds of that estimated as just compensation by Follett. We therefore hold that the superior court did not abuse its discretion in denying the motion for new trial.

## VI. Attorney's Fees and Costs

Since the award of the superior court was in excess of the amount deposited by the state by more than ten percent, the state does not dispute the general validity of awarding attorney's fees and costs to the landowners pursuant to Civil Rule 72(k)(2).[25] The state argues, though, that certain fees and costs awarded were not justified under the rule. The state requests that we require fees and costs to be "necessarily incurred" in the course of litigation for them to be awarded under subsection (2) of Civil Rule 72(k) as we already require for awards under subsection (4) of the rule, in cases where the allowance of costs and attorney's fees appears necessary to achieve a

just and adequate compensation of the owner. *Stewart & Grindle, Inc. v. State*, 524 P.2d 1242, 1250 (Alaska 1974). The state further urges that a successful defendant in an eminent domain action be required to bear the burden of substantiating that the costs and fees it claims were reasonably necessary to defend the action.

 We agree with the state that only expenses "necessarily incurred" in defending an eminent domain action should be awarded under subsection (2) of Civil Rule 72(k), despite the fact that only subsection (4) requires that the award appear necessary to achieve just compensation.[26] Automatically awarding all costs claimed by a party under subsection (2) of the rule is not mandated by the constitutional requirement of just compensation, any more than it is constitutionally required under subsection (4). *See Department of Highways v. Salzwedel*, 596 P.2d 17, 20–21 (Alaska 1979). There exists no more persuasive rationale for allowing a party to recover unnecessary expenses in cases where the party obtains an award ten percent higher than that deposited by the state or awarded by the master, and therefore becomes entitled to an award for costs and fees under subsection (2), than when the party does not meet the ten percent requirement and must rely on subsection (4) to obtain an award for costs and fees. We are of the further opinion that the defendant claiming costs and fees under the rule should be required to document them in reasonable detail so that it may be determined whether they were reasonably necessary to the defense of the action.

 In the case at bar, we are persuaded that there is merit in the state's argument that certain fees and costs were

---

**25.** Alaska R.Civ.P. 72(k) reads:

*Costs.* Costs and attorney's fees incurred by the defendant shall not be assessed against the plaintiff, unless:

(1) the taking of the property is denied, or

(2) the award of the court was at least ten (10) percent larger than the amount deposited by the condemning authority or the allowance of the master from which an appeal was taken, or

(3) the action was dismissed under the provisions of subdivision (i) of this rule, or

(4) allowance of costs and attorney's fees appears necessary to achieve a just and adequate compensation of the owner.

Attorney's fees allowed under this subdivision shall be commensurate with the time committed by the attorney to the case throughout the entire proceedings.

**26.** *See* note 25 *supra.*

not shown to be "necessarily incurred" as to one item—fees to Michael McCracken for the preparation of appraisals for parcels four and seven. These appraisals were conducted only shortly before trial after a change in counsel for the landowners had occurred. The appraisals were excluded from evidence because they were submitted subsequent to the state's deposition of McCracken, wherein he stated he was unprepared to comment on any new appraisals, thereby denying the state proper discovery regarding the appraisals. In *Department of Highways v. Salzwedel*, 596 P.2d 17, 20–21 (Alaska 1979), we held a party responsible for his attorney's error in pursuing an unmeritorious legal claim in a condemnation proceeding, and held expenses claimed for that work not to be "necessarily incurred" and therefore unrecoverable under Civil Rule 72(k)(4). We think it proper in this case to likewise charge the defendant landowners with the failure to obtain McCracken's appraisals at a time that would have enabled their use as evidence. The landowners' argument that preparation of formal written appraisals by McCracken was necessary for him to prepare as an expert witness, when several other formal appraisals were already available to him, does not convince us that the cost of his appraisals was "reasonably necessary" to defend the landowners' position. However, even though McCracken's appraisals were excluded from evidence, McCracken not only testified at trial, but also acted as a consultant for the landowners' counsel. In fact, the state conceded that McCracken's services as a consultant may have merited some value. Therefore, as to the $16,712.50 in expenses claimed for McCracken's services, we reverse the superior court's award of expenses claimed for the preparation of McCracken's appraisals for parcels four and seven, and remand for a determination of those portions of McCracken's costs which were not related to the preparation of the appraisals but were necessarily incurred.

■ We decline to reverse the superior court's award for the other items of costs and fees which the state disputes. As to $15,000 in attorney's fees awarded to the attorney who first handled the case for the landowners, the state argues that the fees may have included settlements for other claims in a lawsuit between the attorney and the landowners over fees. However, the record shows that upon the court's request after the state's objection to these fees, the landowners submitted an affidavit from their house counsel that the $15,000 was the portion of the settlement attributable to the attorney's work in this case, which amounted to 250 to 300 hours. The attorney in question handled the case for over two years and did considerable amounts of work. We cannot agree with the state's contention that more documentation than was presented is required to show these expenses to be "necessarily incurred."

■ The state's remaining objection is to the award of $25 each to two individuals for testimony as expert witnesses, on the grounds that they were not qualified or introduced as experts at trial. These fees were documented in the detailed costs bill submitted to the court by the landowners. One of the witnesses was a local real estate consultant, and the other was a prominent local developer. Their testimony concerned almost exclusively their opinions about the probable value of the condemned property, based on their experience in the Fairbanks real estate market. Their credentials were established prior to their testimony. The state has provided no definition of an "expert witness" from which we could conclude these witnesses were not entitled to fees for their testimony under Alaska Administrative Rule 9(c), nor has the state shown that the superior court abused its discretion under the rule in permitting more than three expert witnesses to testify on the valuation issue.[27]

27. Alaska R.Admin.P. 9(c) provides:

*Expert Witnesses.* A witness called to *testify as an expert witness* shall receive additional compensation to be fixed by the judge with reference to the value of the time employed and the degree of learning or skill required; but such additional compensation shall not exceed $25.00 per hour while so

## VII. Assessment of Interest on the Award for Just Compensation

The trial judge established pre-judgment interest at six percent, but assigned an eight percent rate to post-judgment interest. Both parties appeal this decision. The state claims that post-judgment, as well as pre-judgment interest, should run at six percent under AS 09.55.440(a). The landowners argue that both pre-judgment and post-judgment interest should run at eight percent after September 12, 1976, the date the legislature changed the general legal rate of interest in the state to eight percent.

■■■ While the parties appeared to eventually agree with the superior court's decision at trial, we conclude that the court committed plain error in not adopting the position the state asserts on appeal. The language of AS 09.55.440(a) unambiguously provides that the rate of judgment interest awarded under a declaration of taking proceeding such as this case will equal six percent for the time before and after judgment is entered:

> The judgment shall include interest at the rate of *six per cent per year on the amount finally awarded* which exceeds the amount paid into court under the declaration of taking. *The interest runs from the date title vests to the date of payment of the judgment.* [emphasis added] [28]

The landowners point to the fact that the statute establishing the legal rate of interest and the statute providing for the rate of interest on judgments in general in Alaska have been amended to provide for a rate of eight percent.[29] They further point out that the higher rate now applies to eminent domain cases where the state condemns property under a complaint seeking condemnation and an order for possession, rather than a declaration of taking, by virtue of the AS 09.55.330 provision that the "lawful" rate of interest applies to judgments in the former cases.[30] The landowners argue that the legislature's failure to amend AS 09.55.440(a) to provide for eight percent interest was a clear oversight on the part of the legislature, and ask this court to remedy the mistake.

■■■ We note the disparity between the interest rate specified in AS 09.55.440(a) and the other statutes mentioned. We also are concerned about the inequity in awarding a higher rate of interest on judgments obtained in one form of eminent domain proceeding than in another, as may result from the current provisions of AS 09.55.-440(a) and AS 09.55.330.[31] We strongly

employed and testifying, except as otherwise provided in these rules. No more than 3 expert witnesses shall be allowed to testify on each side as to the same issue in any given case, unless the judge trying the case, in his discretion, permits an additional number of witnesses to testify as experts. [emphasis added]

28. This provision was enacted in 1962, and has never been amended (ch. 101, § 13.21, SLA 1962).

29. The statute setting the general legal rate of interest in Alaska, AS 45.45.010(a), was amended to increase the rate of interest from six percent to eight percent in 1976 (ch. 159, § 1, SLA 1976). The statute providing for the rate of interest for judgments in general, AS 09.30.-070, was amended to increase the interest rate from six percent to eight percent in 1969 (ch. 69, § 1, SLA 1969).

30. This provision was enacted along with the provision applying to declarations of taking in 1962 (ch. 101, § 13.10, SLA 1962). The land-

owners note also that AS 09.50.280 awards interest at the "legal" rate specified in AS 45.-45.010(a), for judgments rendered against the state in contract and tort actions. This provision also dates from 1962 (ch. 101, § 26.04, SLA 1962).

31. Under a declaration of taking, title and right to possession pass to the state immediately upon filing and depositing an amount for just compensation, while under a complaint for condemnation this "taking" does not occur until judgment is entered by the court. *Arco Pipeline Co. v. 3.60 Acres*, 539 P.2d 64, 70 (Alaska 1975). A rational explanation for assessing a lower rate of interest against the state prior to judgment in cases where it gains control and use of the property at an earlier time does not occur to us. Furthermore, interest is only assessed on the amount of the award in excess of what was deposited by the state at the time of the declaration of taking. *Stewart & Grindle v. State*, 524 P.2d 1242, 1248 n.21 (Alaska 1974); *Russian Orthodox Greek Catholic Church v. Alaska State Housing Auth.*, 498 P.2d 737, 741–

urge the legislature to consider amending what appears to be a defect in the current statutory scheme. But we decline to repeal by judicial action the clear and unambiguous provision of an enactment of the legislature on the grounds that it must be an oversight.[32] A statute such as AS 09.55.-440(a), specifically addressed to the subject of interest on judgments under a declaration of taking must take precedence over statutes pertaining to more general subject matter. Neither are the provisions of AS 09.55.440(a) irreconcilable with those pertaining to another form of eminent domain proceeding in AS 09.55.330. Absent more evidence that the legislature intended otherwise, we must presume the legislature was aware of the existence of AS 09.55.-440(a) when it enacted amendments raising the rate of interest on judgments in other cases, and made a conscious decision not to amend AS 09.55.440(a).[33] The superior court should have, under AS 09.55.440(a), awarded interest at the rate of six percent on the award for the time both before and after judgment.

The judgment of the superior court is AFFIRMED in part, MODIFIED in part, and REMANDED for a determination of costs in accordance with this opinion.

BOOCHEVER, J., not participating.

---

42 (Alaska 1972). Thus, the State is encouraged to use the more onerous declaration of taking procedure and to deposit small sums into court. The irony in this is that the reason no interest is allowed on the deposited amount is because the condemnee is free to withdraw that money and use it—including depositing it in a bank account which could legally earn up to eight percent interest under AS 45.45.010(a).

**32.** The landowners suggest in their brief on appeal that awarding a lower rate of interest on judgments in eminent domain cases than for other judgments may run afoul of the constitutional requirement of "just compensation." We do not reach this issue because it was not argued at the trial level. *See Von Brimer v.*

*Whirlpool Corp.*, 536 F.2d 838, 848 (9th Cir. 1976); *Brown v. Wood*, 575 P.2d 760, 766 (Alaska 1978), *modified*, 592 P.2d 1250 (Alaska 1979); *10 C. Wright & A. Miller, Federal Practice and Procedure* § 2716, at 435–36 (1973).

**33.** *But cf. Rand v. B. G. Pride Realty*, 360 A.2d 519, 523 n.4 (Me.1976). In that case, the court concluded that it would continue to use the legal rate of interest specified in a statute that was repealed shortly before the judgment, in assessing pre-judgment interest, on the grounds that the failure to replace the repealed statute was inadvertent, and that long-standing use of the rate rendered it appropriate to adopt as a judicial rule.

APPENDIX "A"

# STATE OF ALASKA
# DEPARTMENT OF HIGHWAYS
### PROJECT № S-0649(2)

# GEIST ROAD

PARCEL VICINITY MAP
SCALE 1" = 2000'