CITY OF VALDEZ, Alaska, Appellant,

v.

18.99 ACRES, MORE OR LESS, OF LAND SITUATED IN the CITY OF VALDEZ, Alaska; A & G Construction, Inc.; George Atkinson; Paul J. Nangle; Sontag Enterprises, Inc.; Estate of Herman J. Sontag; and State of Alaska, Appellees.

No. 6940.

Supreme Court of Alaska.

June 22, 1984.

Kenneth P. Jacobus, Hughes, Thorsness, Gantz, Powell & Brundin, Anchorage, for appellant.

Nelson G. Page, Burr, Pease & Kurtz, Anchorage, and Robert A. Mintz, Anchorage, for appellees.

Before BURKE, C.J., and RABINOWITZ, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

RABINOWITZ, Justice.

In an effort to avoid construction delays and a complicated trial concerning property valuation, the City of Valdez and the owners of property the City was planning to condemn agreed that a panel of arbitrators should decide the fair market value of the property. Dissatisfied with the arbitrators' decision, the City requested that the superior court overrule them. The court refused, entering judgment for the amount the arbitration panel had awarded. We affirm.

## I. BACKGROUND.

When the City of Valdez decided to build a port, Ammunition Island was one logical

site. It was so identified in a February 1978 study by Dames & Moore, which the City had commissioned in 1977. By the summer of 1979, Ammunition Island had become one of two plausible locations for a public port, and the Corps of Engineers' 1980 approval of a permit for the site left little doubt that the City would eventually purchase or condemn it. As site selection progressed, so did the other parts of the port project: the City commissioned economic and feasibility studies, raised money with an April 1979 bond election, and hired a contractor.

Negotiations with the owners of the Ammunition Island site—George Atkinson, Paul Nangle, A & G Construction, and Herman Sontag[1]—broke down in the early summer of 1980. With its contractor ready to proceed, the City began work in August. The property owners objected to the City's trespass, declarations of taking were filed, and shortly thereafter construction finally commenced.

Evaluating the tracts as of August 15, 1980, the date of taking, was difficult. Comparable sites in the Valdez area were hard to identify. The property's highest and best use—port site, barge dock, general industrial—was not immediately clear. Certainly the City's interest in and discussion of a port project had increased the site's value. The extent to which this increase was compensable raised complicated factual and legal issues. Whether and for what purposes the arbitrators could legally have used economic and feasibility studies the City had commissioned when they determined the property's fair market value is the principal legal issue raised in this appeal.[2]

Other problems made evaluating the property more difficult. There was an initial question about whether or not the prop-

erty owners had abandoned their access route to the dock site. (The arbitrators eventually found that the property owners had not abandoned the access route and the City does not raise this issue on appeal.) One tract had been rented from the City, and was subject to the City's right to grant an easement across it. When the property owners had attempted to develop a dock, they had obtained a Corps of Engineers permit, and one condition of the permit was that they might have to restore the property to its original condition if the permitted work was not completed; because they did not finish the dock, an obligation may have been owing to the Corps, and that obligation arguably reduced the property's fair market value. Given these and other factual difficulties and the City's pressing need to begin work on its port project, the parties decided to submit the valuation question to arbitration. Stipulations established that three arbitrators were to find facts and the superior court was to answer "[q]uestions requiring a determination of law rather than fact." A list of potential legal questions was agreed to. "Should any party desire to raise issues of substantive law to be decided by the court or desire to instruct the arbitration panel respecting the law to be applied," the final stipulation recited, those issues and instructions were to be submitted to the superior court before the arbitrators began to deliberate.

The parties and the superior court worked out a set of instructions to be given to the arbitration panel. Four days later, the panel began what were to be ten days of hearings. After these were over, it considered the facts, the instructions, and an elaborate set of special-verdict-like questions. The panel reported its decision on a form attached as an appendix to this opinion.

1. Both Sontag and his corporation, Sontag Enterprises, Inc., were defendants in this action. For purposes of this opinion, all persons and entities with compensable interests in the condemned property will be described as "the property owners."

2. The studies were, among other things, City property in the public domain, evidence of what the site was worth to the City, evidence of what

the site's highest and best use was, and valuable collections of data on the Valdez, Alaska and world economies. In determining condemned property's fair market value, fact-finders must not consider what the property is worth to the taker, but must determine the property's highest and best use in private hands. See p. 688 *infra*. The studies were thus both useful and capable of misuse.

After deciding to consider the economic and feasibility studies, the panel, composed of three M.A.I. appraisers with commercial waterfront experience, valued the two principal tracts (Tracts 1 and 2) at $1,450,000. If they had not considered the studies, the arbitrators reported, they would have valued these two tracts at $575,000—an $875,000 difference. As for the tract which the property owners had been renting from the City (Tract A), the arbitrators concluded that its capitalized fair market value over the lease term was $35,000; that the capitalized value of the rent the property owners would have had to pay was zero; and that the fact that the City could have granted itself an easement across the property did not reduce the property's fair market value. They then decided that the fourth tract (Tract 3) was worth $15,000 as of the August 15, 1980 valuation date. Finally, they found that any obligation that might have been owing to the Corps of Engineers was not concrete enough to reduce the property's fair market value. The panel thus valued the property owners' total interests at $1,500,000.[3]

Dissatisfied with the arbitrators' decision, the City turned to the superior court. The superior court rejected the City's appeal, concluding that the arbitrators' factual determinations had left it with very few legal questions to decide. With respect to the feasibility studies, the court found that the arbitrators had been properly instructed not to consider the influence of the proposed project on the property's value. The court concluded that the arbitrators' decision to use the feasibility studies was a valid "exercise of their fact finding function."[4]

As to the other disputed findings, the superior court found that the arbitrators had not warped the rules of "evidence or ... law or even the principles of proper appraisal" in order to arrive at their conclusions.[5] Final judgment was eventually entered, and this appeal followed.

## II. THE PROCEDURE THE SUPERIOR COURT USED WAS FAIR.

■ At the outset we must consider Valdez's vigorously argued contention that the

3. The City of Valdez disagrees with almost all of these interpretations of the report form. See Section II and notes 17 and 18 *infra*.

4. Specifically, the superior court stated:

> I am persuaded by Mr. Mintz's argument [on behalf of Atkinson and A & G] that—that the factual determinations which the arbitrators made obviate the need to make the legal decision which Mr. Jacobus [counsel for the City] is—is requesting the Court to make. I think the case was submitted to the arbitrators under proper instructions on what they could and could not consider in their determinations of value with respect to these tracts of land, and that those instructions did not permit them to utilize improperly the feasibility studies. So that their use of the feasibility studies, if I'm going to engage any presumption of validity in the arbitrators' proceedings, and I think I must, then their deter—their decision to utilize the feasibility studies, I feel, is one which should be approved by the Court. Quite simply, it seems to me they were properly instructed not to consider the influence of the project on the property values here and if—and if indeed they followed the instructions, and nevertheless used the feasibility studies, there's no reason why I should find that to be an invalid exercise of their fact finding function in this case.

5. The superior court stated:

> With respect to the fill and the easement, and the rental issues, I don't feel that I have to warp the evidence or the law or even the principles of proper appraisal to come out with the same result that the—that the arbitrators get. Based on what was—what was presented to them, at the arbitration proceedings, I think it was well within their province to find that the value of the—capitalized value of the rent was not subject to consideration because the City was not collecting it anyway. I think that was within their province to make that finding and I think they made it, otherwise I don't think they would have come up with a zero answer under Paragraph 3(b) [value of rent] and I think similarly, Mr. Buckalew's arguments [on behalf of Sontag] with regard to the fill issue and the easement issue are similarly answerable.
>
> I think what occurred here is the arbitrators, based on facts that they found, obviated the need to address the legal issues, and I'm going to grant the cross motion which the property owners have filed, in toto. (Pause) I have signed the judgment. And I think that's the end of that case except for the determination of costs and attorney's fees.

procedures the superior court used were fundamentally unfair and failed to comply with the parties' stipulations. The City believes that the parties drew a significant distinction between factual and legal issues, and that when the superior court decided to defer to the arbitrators' factual findings it both misused those findings and disregarded its own responsibilities under the stipulations. This argument is made most forcibly with respect to the economic and feasibility studies the City had commissioned.[6] Here Valdez contends, first, that the arbitrators were to apply two different legal theories to the facts before them, not to choose between them, and second, that if the arbitrators did indeed choose between the alternatives the superior court had no reason to defer to their choice. Because we think that the City's view of these procedures is, while understandable, inconsistent with the terms of the agreements between the parties, we reject its arguments

and conclude that the superior court's approach was essentially correct.

The parties' first important stipulation established that "all the provisions of law and the civil rules shall apply to this case including, without limiting the generality of the foregoing, the determination and award of just compensation, interest and attorney fees, except that the amount of just compensation shall be determined by binding arbitration rather than by a master, jury or the court." The parties amended their stipulation in several important ways not long before the arbitration was to begin, agreeing, among other things, that "[q]uestions requiring a determination of law rather than fact" were to be decided by the court, but that there would be "legal questions on which the panel makes decisions...."[7]

From the original and amended stipulations we can draw several conclusions. First, it seems that legal issues were at least initially to be raised to the superior court before the arbitrators met and were

6. Valdez makes the same argument with respect to the arbitrators' conclusions pertaining to an alleged obligation to remove fill. We answer this particular objection at note 18 *infra.*

7. In the amended stipulation, the parties agreed that:

> The intent of this Stipulation is that formal rules of evidence and procedure shall not apply to the arbitration proceedings. Rather, the arbitrators shall have discretion to conduct the arbitration proceeding in any way they believe to be fair and to consider any evidence they believe to be relevant in making the determinations required by their instructions.
>
> Further, it is the intent of this Stipulation that factual matters involved in determining the amount of just compensation shall be determined by binding arbitration rather than by a master, jury or court.
>
> \*　\*　\*　\*　\*　\*
>
> Subject to the limitations of the preceding paragraphs, the substantive provisions of law and the Alaska Rules of Civil Procedure shall apply to this case including, without limiting the generality of the foregoing, the determination and award of just compensation, interest and attorney fees.
>
> Questions requiring a determination of law rather than fact shall be decided by the court. Such questions may include, but are not necessarily limited to, whether the property owners are entitled to enhancement of value at-

tributable to the feasibility and other studies, whether the award to the property owners must be reduced by the cost of removing Tract D fill, whether the value of Tract A includes the value of the reserved right-of-way, and whether the property owners have a compensable interest in Tract 3.

> Should any party desire to raise issues of substantive law to be decided by the court or desire to instruct the arbitration panel respecting the law to be applied, such issues or instructions must be delivered to the other parties by June 5, 1981, but may be supplemented by June 9, 1981 at 1:30 P.M., and will be addressed at the June 11, 1981 conference. Additional instructions or questions which are approved by the court or approved by all parties may be submitted to the panel after the June 11, 1981 conference but not later than the time the panel adjourns to deliberate.
>
> \*　\*　\*　\*　\*　\*
>
> In addition to determining the fair market value of defendant's property interests in Tracts 1, 2 and A, the arbitration panel shall also determine the fair market value of defendant's property interest in Tract 3, if any, as of August 15, 1980. The fair market value determined by the panel will be, except as provided herein, binding and non-appealable. However, the legal question of the existence and nature of a compensable interest for the property owners and the other legal questions on which the panel makes decisions will be appealable as discussed [above].

to be resolved in the instructions which they were to be given. Second, the parties believed that the panel would be making decisions on legal questions. Finally, legal decisions made pursuant to the instructions were to be "appealable." In itself the stipulation does not determine whether the question of whether and for what purposes the economic and feasibility studies could be used was initially to be decided by the panel or exclusively reserved for the trial judge.[8] On the other hand, the question of who was to make the initial determination as to whether the studies could be used was settled by the terms of the special verdict form and instructions on which the parties agreed.

In this regard the panel was specifically instructed that:

> The value of the property interests condemned shall be calculated as the fair market value thereof at the date of taking.

> Fair market value is defined as the price in money which a purchaser willing but not obligated to buy the property would pay to an owner willing but not obligated to sell it, under conditions where both buyer and seller are both [sic] knowledgeable about the property, taking into consideration all uses for which the land was suited and might in reason be applied.

And the form the arbitrators were to use told them first to determine fair market value and then to report on whether or not in making this determination they had considered the studies:

*Tracts 1 and 2*

II. On August 15, 1980, what was the fair market value of property owners' interest in

Tract 1 $_____

Tract 2 $_____

A. Was your determination of the fair market value of the property owners' interest in Tracts 1 and 2 affected by the various feasibility studies and other studies completed for the City of Valdez prior to the date the site of the dock project was selected?

Yes _____ No _____

If yes, what would your determination have been had you not considered those studies?

1. Tract 1 $_____

2. Tract 2 $_____

We think it clear from the foregoing that the arbitrators were not simply applying two alternative theories of law to the facts, but were in fact choosing between them. This is how the superior court analyzed the situation. Its characterization of the arbitrators' choice as factual rather than legal may have been technically incorrect, but the superior court correctly perceived that the legal questions concerning the studies depended in large part on factual questions committed to the arbitrators.

These legal and factual questions will be discussed in more detail immediately below. For now, it is sufficient to say that one argument against the studies, that they were "part of the [port] project," was purely legal, and that another argument, that they were conducted after the property was within "the scope of the [port] project," depended on a factual determination. Although we do not think that the superior court should have deferred to the arbitrators on the purely legal "part of the project" question, we also think that the result the superior court reached was correct. As for the factually dependent "scope of the project" arguments, we conclude that the superior court's decision to defer to the panel was legally justified.[9]

---

8. We think the stipulation is ambiguous on this point: "questions [to be decided by the court] may [not "shall"] include, but are not necessarily limited to, whether the property owners are entitled to enhancement of value attributable to the feasibility and other studies . . . ."

9. What standard of review the superior court should have applied to the panel's factual findings is not clear, and the parties did not brief this issue in sufficient detail. Neither side mentions the Uniform Arbitration Act, AS 09.43.010 et seq. If this Act does not apply to this particu-

## III. THE ARBITRATORS' DECISION TO USE THE CITY OF VALDEZ'S STUDIES.

On the merits, we hold that there was no reversible error in the panel's use of the studies the City of Valdez commissioned. Geotechnical and environmental evaluations of a particular site help demonstrate how a particular piece of property can best be used. Studies showing that a port project would be economically feasible make sites on which that project might be located more valuable. Had these studies not been conducted, the panel concluded, the property in question would have been worth $625,000, not $1,500,000. Nothing in the record suggests that this conclusion is erroneous. Nevertheless, Valdez now argues that the panel's decision to use these studies was legally and factually incorrect, and asks this court to reduce the arbitrators' award by $875,000.

We think it important to note that Valdez is not trying to distinguish among the ways in which the arbitrators could have used the studies to determine the property's fair market value; instead, it advances the more limited contention that as a matter of law the arbitrators could not legally have used the studies for any value-related purpose. Its all-or-nothing position has been consistent: it had an opportunity to submit cautionary instructions to the arbitrators, and none were submitted. Because the studies were clearly relevant to an inquiry into the property's highest and best use, *cf. City of Los Angeles v. Decker*, 18 Cal.3d

860, 135 Cal.Rptr. 647, 558 P.2d 545 (1977),[10] many of Valdez's contentions must be rejected out of hand.

■ A sizeable portion of Valdez's principal argument can be reduced to a play on words. A piece of property, it says, cannot be valued as part of the project for which it was condemned. The studies were part of the project. Therefore, it concludes, the arbitrators' decision to consider the studies was legally erroneous. But similar arguments made four years ago were rejected by this court. In *State v. Alaska Continental Development Corp.*, 630 P.2d 977 (Alaska 1980), a case involving highway condemnation, we held that

> value resulting from the general knowledge that the [highway] project was planned was proper to consider up to the date the route was chosen.

*Id.* at 984–85. The announcement that this highway project was underway was just as much a part of that project as the studies at issue here were part of the City of Valdez's port development. Because we held in *Alaska Continental* that value resulting from this announcement was compensable,[11] we reject Valdez's semantic "part of the project" arguments as meritless.[12]

We believe, however, that Valdez's arguments obscure a more difficult problem. It is not difficult to imagine cases in which a local government's preliminary work on a public project actually changes the highest

lar arbitration, factual mistakes amounting to "gross error" are reviewable. *Nizinski v. Golden Valley Electric Ass'n*, 509 P.2d 280 (Alaska 1973). If the Act applies, it insulates even gross factual errors from judicial review. *Alaska State Housing Authority v. Riley Pleas, Inc.*, 586 P.2d 1244 (Alaska 1978). We will assume that gross factual errors would justify setting aside the arbitrators' award; however, as will be shown below, our review does not reveal any gross factual errors.

10. *See also: Martens v. State*, 554 P.2d 407, 409 (Alaska 1976); *Indiana & Michigan Elec. Co. v. Hurm*, 422 N.E.2d 371 (Ind.App.1981).

Valdez's argument that highest and best use was not in issue ignores two facts: the arbitrators were specifically required to determine the

property's best use in private hands, and the City's own expert testified that the site was best suited for industrial use, not for a private port.

11. We followed Nichols' "indefinite location" rule. See 4 J. Sackman, Nichols' The Law of Eminent Domain § 12.3151[2], at 12–459 to 12–460 (rev. 3d ed. 1981); see *Alaska Continental*, 630 P.2d at 985.

12. When fact-finders are attempting to determine the fair market value of a piece of property being condemned, they should not evaluate the property as if it were part of the project for which it is being taken. See generally 4 Nichols, *supra* note 11, § 12.315. Here, however, there is no evidence that the arbitrators evaluated the property as a public port site.

and best use a piece of property has in private hands. In fact, we can assume for purposes of argument that this has happened here: without studies showing that a port would be economically feasible, no tract of Valdez land would be best used as a private port; without studies showing that the condemned property was seismically sound, no private developer would have wanted to locate a port on it. In this way the property's highest and best use—and resulting value on the private market— may have been the City of Valdez's creation. Once one strips away the semantics, Valdez's most telling point is that it should not have to pay for values for which its own efforts are responsible.

■ This objection's force extends well beyond values which the project for which property was condemned has created. But it is settled law that if unrelated governmental actions enhance a tract's value—by civic support, for example, for an aggressive and well-financed shippers' association—the property's owner is entitled to additional compensation. Moreover, if two separate public projects will affect one tract, the owner of property taken for one project is entitled to compensation for the enhanced value the other project would have brought to his or her property. *Alaska Continental*, 630 P.2d at 983, following 4 Nichols, § 12.3151[3].

■ We will not require fact-finders to deal in abstractions. Valuation should try to exclude values which appear when the market is distorted; when the market is functioning normally, the evidence it presents should be considered. We believe that the proper time to exclude project—enhanced value from a fact-finder's calculations is when the property is likely to be condemned and its market value thus reflects the owner's chance to "hold up" the government which is planning to take it. Until then, project-enhanced value is compensable.

■ We thus conclude that the problem of government-created highest and best uses can be solved by applying the "scope of the project" rule, which we discussed briefly in *Alaska Continental* and which has been exhaustively examined by courts and commentators.[13] One court has stated the rule in the following way:

> If the condemned land was probably within the scope of the governmental project for which it is being condemned at the time the Government became committed to that project, then the owner is not entitled to any increment in value occasioned by the Government's undertaking the project.

*U.S. v. 320.0 Acres of Land*, 605 F.2d 762, 781–82 (5th Cir.1979). To this we add that whenever it becomes likely that the property will be condemned—whether or not the property was originally within the project's scope—project-enhanced value ceases to be compensable. *See Merced Irrigation District v. Woolstenhulme*, 4 Cal.3d 478, 93 Cal.Rptr. 833, 483 P.2d 1, 13–14 (1971) (en banc). The rule thus prevents property owners from receiving many unjustified windfalls, as when, for example, formal condemnation of property which everyone knows will be taken is delayed. See *Woolstenhulme*, 93 Cal.Rptr. at 845–846, 483 P.2d at 9. We believe that this rule properly separates general government-caused value enhancement from the specific situations in which a government may well have to pay twice for its preliminary project work—once directly, and again as compensation for the value the preliminary work adds to condemned property. Because the scope of the project rule was presented to the arbitrators, we conclude that the superior court properly refused to upset the most significant part of their award.

■ "Scope of the project" arguments, unlike the "part of the project" argument we have rejected, depend on questions of fact. *Alaska Continental*, 630 P.2d at 984. While the legal instructions to the arbitrators embodying this rule were not complete, they did quote *Alaska Continen-*

---

**13.** A detailed resume of this rule's history is not necessary here. See *U.S. v. 320.0 Acres of Land,*

605 F.2d 762, 781–93 (5th Cir.1979).

*tal* 's most important reference to the rule [14] and the arbitrators were specially warned against awarding compensation for "hold up" value. Although a clearer and more detailed statement of the rule would have been preferable,[15] arguments based on the rule were in fact presented to the panel and to the superior court. Our review of the record persuades us that the rule was properly applied below. On the facts before them, the panel and the superior court could have concluded that the studies were complete several months before the Ammunition Island property was within the project's scope.[16] Given the limits on the question we must answer—on the facts presented to it, could the panel legally have considered the studies?—the arbitrators' factual conclusions end our inquiry.

## IV. MISCELLANEOUS VALUATION ISSUES.

### A. *Valuation of the Property Owners' Leasehold Interest.*

 The other issues this case presents require rather less detailed examination.

One of the tracts the City of Valdez condemned was in fact owned by the City and leased to the property owners. The lease which property owner Sontag had signed provided for periodic rent adjustments and reserved a right in the lessor (then the State of Alaska, eventually replaced by the City) to grant easements across the property. Instructed to compute the leasehold's fair market value, reduce it to present value, subtract the capitalized value of the rent the property owners would have paid, and determine what deductions, if any, should be made to reflect the City's easement rights, the arbitrators concluded that on the date of taking the property owners' interest was worth $35,000. In reaching this figure they decided that the capitalized value of the rent that would have been paid was zero and that the easement rights did not reduce the leasehold's fair market value. Our review of the record does not persuade us that the arbitrators committed error, gross or otherwise.[17]

**14.** "[V]alue resulting from the general knowledge that the project was planned was proper to consider up to the date the route was chosen ...." *Id.* at 984–85.

**15.** *Alaska Continental's* summary of the rule was correct on that case's facts. To guard against interminable wrangles over the instant at which a particular property is "selected," and to recognize that property may be likely to be condemned long before formal "selection" takes place, we adopt *Woolstenhulme's* "probability" test. See 93 Cal.Rptr. at 832–833, 483 P.2d at 12–13. We note that the City of Valdez did not object to the rule which was stated to the arbitrators; its one objection was to the superior court's refusal to add a duplicative sentence to the instruction.

Valdez's position was that the superior court's instruction to the arbitrators should emphasize that "project enhanced value" due to general knowledge that the was planned could not be considered after the site was selected. More specifically, Valdez's sole objection to the court's instructions on project enhanced value was that "... we have to have one more sentence—which would state that after a particular date no compensation shall be made for—or no compensation shall be allowed for enhancement caused by the ...." The superior court correctly believed that this sentence would have been redundant.

**16.** The last study was completed in September 1979. At this time, the City of Valdez was applying for a Corps of Engineers permit with respect to the Ammunition Island site, but had not yet received it. The City had emphasized in a June letter to the Corps that it was also investigating an alternative site on which it did not want to "close the door." In October, the City presented its plans to a conference at which several state and federal agencies were represented, and the Ammunition Island proposal was greeted with some skepticism. It was not until January 24, 1980 that the Corps granted a permit for development of the Ammunition Island property, and we think that reasonable arbitrators could easily have concluded that condemnation of that site was not "probable" until that date. We also note that the City Council did not vote to condemn the property in question until July 7, 1980.

**17.** As part of its policy to encourage development, the City did not always collect rent from private developers. When property owner Atkinson tendered rent for the tract the property owners were leasing, the City returned the rent. The arbitrators were properly instructed on waiver and the ways in which to compute

## B. *The Property Owners' Obligation To Restore Property To Its Original Condition.*

 Another problem arose over a permit which the property owners had received from the Army Corps of Engineers. Under this permit's terms, the Corps had the right to require the property owners to restore certain tidal land to its original condition, if the barge dock project for which the property owners had sought the permit was abandoned or not finished by a specified date. Evidence submitted to the panel suggested that the permit's time had run but that, when the property was taken, the Corps had not yet demanded restoration. The arbitration panel's task was to determine whether or not this as yet unenforced obligation reduced the property's fair market value. Finding that it did not, the arbitrators also concluded that if the Corps had chosen to exercise its right the property's value would have decreased by $18,500.[18] The record shows that whether or not to require restoration was up to the Corps and that it was quite possible that the Corps would not have required the property owners to restore the property to its original condition.[19] We decline to reverse the arbitrators' factual findings.

## V. AS 09.55.440(a) IS UNCONSTITUTIONAL.

 One other issue requires comment. As it entered judgment in this case, the superior court held that AS 09.55.-440(a), which fixes the pre- and post-judgment interest awarded in "quick-take" condemnations at six percent, was unconstitutional. We affirm. In most Alaskan lawsuits, including some condemnation actions, trial courts must assess pre- and post-judgment interest at the legal rate of 10.5 percent. AS 09.30.070 and 09.55.330. Condemnation proceedings which begin with a declaration of taking constitute what we have twice warned is an unsound exception. *State v. Alaska Continental Development Corp.*, 630 P.2d 977, 995–96 + nn. 28–32 (Alaska 1980); *Triangle, Inc. v. State*, 632 P.2d 965, 971 (Alaska 1981). If the State or one of its subdivisions condemns property via a declaration of taking, it gains immediate title and right to possession, but the interest it must pay is only six percent.

present value; and their apparent conclusion that the City would have continued to adhere to its no-rent policy is a reasonable one. It is true that rent might have been adjusted pursuant to the lease and that the City might, as its representatives said at the valuation hearing, have begun to collect it, but how likely these events would have been was a factual question committed to the arbitrators. On the record we cannot say that their findings were erroneous.

Nor can we conclude as a matter of law that the City of Valdez's unexercised right to grant easements and rights-of-way reduced the property's fair market value. Appellant's reliance on *Wessells v. State*, 562 P.2d 1042 (Alaska 1977), has nothing to do with the issue given to the arbitrators. In that case the State condemned a tract of land that had been leased from it, then argued that the lessee's interest in the land had no value because the State could have granted itself an easement over all of the tract. We rejected this argument and ordered the superior court to compute the value of the property with a 100′ easement running through it. Our opinion did not imply that the easement must have value. Its value, or lack thereof, was a factual issue. The similar issue in this case was properly presented to, and decided by, the arbitrators.

**18.** This is the most logical way to interpret the special verdict form the arbitrators used. First,

the form required them to determine the property's fair market value. Then they were asked if their "determination" had been "reduced" by "the obligation to remove fill imposed by the property owners' Corps of Engineers permit." They answered this question in the negative. Then, according to the form, they were to answer a hypothetical question: "By how much *would* such an obligation reduce the fair market value of the property owners' interest?" (Emphasis furnished.) To this they answered, $18,-500. If the arbitrators had believed that the obligation was a concrete fact, as opposed to a hypothesis, they would have stated that their determination of fair market value had been reduced. They seem to have drawn a distinction between the property owners' inchoate obligations and the concrete duties which would have arisen had the Corps chosen to require restoration, and to have valued this distinction at $18,500.

**19.** The fact that the Corps eventually decided to require the City to do what the Corps could have required the property owners to do does not compel the conclusion that it would have enforced its rights had the property not been condemned.

As we said in *Alaska Continental,* "[a] rational explanation for assessing a lower rate of interest against the state ... in cases where it gains control and use of the property at an earlier time does not occur to us." 630 P.2d at 995 n. 31. Moreover, six percent interest encourages the condemning government to delay payment to the property owner and use what we have called the more onerous condemnation procedure. *Id.* at 996. Although we have twice refused to strike down the statute in the hope that the Legislature would revise it (*Alaska Continental,* 630 P.2d at 996; *Triangle,* 632 P.2d at 971), AS 09.55.440(a) is still on the books, and the property owners correctly argue that it violates the Alaska Constitution's equal protection clause.[20]

We thus affirm the trial court's decision to award pre- and post-judgment interest at 10.5 percent, and hold AS 09.55.440(a) unconstitutional. The lawful rate of interest set forth in AS 09.30.070 thus applies to this type of condemnation.[21]

AFFIRMED.

## REPORT OF ARBITRATION PANEL

*Answer the following questions in accordance with the court's "Instructions to Arbitrators."*

**20.** Awarding different interest rates to property owners on the basis of the type of condemnation action a government brings against them has no rational basis, and appellant has not defended the distinction with anything more substantial than a misguided appeal to stare decisis. Either the general 10.5 percent interest rate established by AS 09.30.070 or the six percent rate established by AS 09.55.440(a) must fall, and we agree with the trial court that "great violence would be done to the general legislative scheme" if we were to apply a six percent rate to all judgments.

Because there is no rational basis for the distinction, we need not decide whether any statute affecting the right to just compensation requires strict scrutiny, and we also need not decide whether a six percent interest rate, standing alone, violates the Just Compensation Clause.

**21.** There is no merit in the two remaining points Valdez has raised in this appeal. The superior court's refusal to disturb the arbitrators' award of attorney's fees was correct. The question was submitted to the arbitrators as a

I. On August 15, 1980, what was the highest and best use of

A. Tract 1 Marine-Oriented Industrial *

B. Tract 2 Hold for future Marine-Oriented Industrial use *

C. Tract A Access corridor *

D. Tract 3 Access corridor *

### Tracts 1 and 2

II. On August 15, 1980, what was the fair market value of property owners' interest in

Tract 1 $ 450,000 **

Tract 2 $ 1,000,000 **

A. Was your determination of the fair market value of property owners' interest in Tracts 1 and 2 affected by the various feasibility studies and other studies completed for the City of Valdez prior to the date the site of the dock project was selected?

Yes X No _____

If yes, what would your determination have been had you not considered those studies?

1. Tract 1 $ 450,000

2. Tract 2 $ 125,000

non-appealable one, and the most serious attack on the award—that it gave Paul Nangle, who had an interest in the property, fees which compensated him for inter-attorneys' conferences—was never argued to the panel. Instead, the City contended that Nangle should receive no fees and the arbitrators quite properly rejected this claim.

Valdez's complaints about foreign handwriting on the final judgment are premature at best. The figures entered above "simple interest" are clearly someone's attempt to compute that interest as of November 18, 1982. A copy of the judgment suggests that the person who made the computations was "LH" and that he or she did the figuring on December 28, 1982. If anyone "deems" the judgment "to be a total judgment of $1,092,362 as of December 28, 1982, with interest from that date until paid," that person will be disregarding the judgment's text, and Valdez may defend itself against this erroneous interpretation in a later proceeding. There is no reason for us to address it.

B. Was your determination of the fair market value of the property owners' interest in Tracts 1 or 2 reduced by the obligation to remove fill imposed by the property owners' Corps of Engineers' permit?

Yes _____ No __X__

\* As a part of the whole property.

\*\* Contributory value as a part of the whole property, i.e., not necessarily the value as a separate entity.

If yes, by how much?

1. Tract 1 $ __N/A__
2. Tract 2 $ __N/A__

If no, by how much would such an obligation reduce the fair market value of property owners' interest in Tracts 1 and 2?

1. Tract 1 $ __6,000__
2. Tract 2 $ __4,000__

Tract A

III.

A. Find the capitalized then fair market value of Tract A, for the remainder of the property owners' lease term, reduced to present value as of August 15, 1980?

$ __35,000__

B. Find the capitalized value of the rent the lessees were required to pay, if any, as adjusted periodically under the terms of the lease, reduced to present value as of August 15, 1980.

$ __-0-__

C. Subtract (B) from (A) and enter the difference or zero, whichever is greater.

$ __35,000__

D. Compute an answer to III(C) (compensation for Tract A leasehold interest) based on the following:

Defendants' property interest in Tract A is subject to the City's right to grant or exercise an easement or right-of-way 100 feet wide across Tract A, and the City need not pay for such an easement or right-of-way.

$ __35,000__

E. Was your determination of the fair market value of the property owners' interest in Tract A affected by the various feasibility studies and other studies completed for the City of Valdez prior to the date the site of the dock project was selected?

Yes __X__ No _____

If yes, what would your alternative determinations for questions in sections III (C) and (D) have been, had you not considered those studies?

1. III (C) $ __35,000__
2. III (D) $ __35,000__

F. Was your determination for the fair market value of the property owners' interest in Tract A reduced by the obligation to remove fill imposed by the property owners' Corps of Engineers' permit?

Yes _____ No __X__

If yes, by how much?

$ __N/A__

If no, by how much would such an obligation reduce the fair market value of property owners' interest in Tract A?

$ __6,500__

Tract 3

IV. Have the property owners abandoned their interest in Tract 3?

Yes _____ No __X__

If no, what was the fair market value of their interest on August 15, 1980?

$ __15,000__

A. Was your determination of the fair market value of property owners' interest in Tract 3 affected by the various feasibility studies and other studies completed for the City of Valdez prior to the date the site of the dock project as selected?

Yes _____ No __X__

If yes, by how much?

$ __N/A__

B. Was your determination for the fair market value of the property owners' interest in Tract 3 reduced by the obligation to remove fill imposed by the property owners' Corps of Engineers' permit?

Yes _____ No __X__

If yes, by how much?

$ _N/A_____

If no, by how much would such an obligation reduce the fair market value of property owners' interest in Tract 3?

$ _2,000_____

Date: _7/15/81_ /s/ Alfred J. Ferrara
 Chairman of the Arbitration Panel