Mary BRIDGES, Appellant,

v.

ALASKA HOUSING AUTHORITY, a public
corporation, Elmer Gagnon and
M. G. Gebhart, Appellees.

No. 142.

Supreme Court of Alaska.

Sept. 20, 1962.

Rehearing Denied Nov. 15, 1962.

Robert A. Parrish, Fairbanks, for appellant.

Henry J. Camarot, of McNealy, Merdes & Camarot, Fairbanks, for appellees.

Before NESBETT, C. J., and DIMOND, J.

DIMOND, Justice.

This litigation arises out of a condemnation action which has been before us previously. The Alaska Housing Authority had filed a complaint and a declaration of taking against appellant, Mary Bridges, and her property in connection with an urban renewal project. After a review of the applicable statutes, we held the Authority did not have the power to use a declaration of taking.[1] In a subsequent decision we directed the trial court to dismiss the action.[2] The effect of this was that the land was returned to appellant. The buildings had been previously destroyed by the Authority.

The present case concerns only the amount of damages to which appellant is entitled for the destruction of her buildings. The trial court awarded her $13,400, with interest, for the value of the destroyed buildings; $500 for inconvenience, mental anguish, humiliation and embarrassment; and attorney's fees in the amount of $2,000 as costs of the action. On this appeal appellant claims that the court applied the wrong measure of valuation to the buildings, and that the $500 award was grossly inadequate. She also claims error in the court's refusal to allow punitive damages

1. Bridges v. Alaska Housing Authority, Opinion No. 1, 349 P.2d 149 (Alaska 1959).

2. Bridges v. Alaska Housing Authority, Opinion No. 8, 352 P.2d 1118 (Alaska 1960).

against the Authority or its officers; in the court's denial of attorney's fees for the previous litigation; and its determination that appellees, Gebhart and Gagnon, were immune from suit and that no recovery could be had against them.

1. *Valuation.*

The Authority produced three witnesses who gave their opinions of the value of the two buildings that had been destroyed. In awarding the sum of $13,400, the trial judge adopted the valuation testified to by the witness, David Simmons.

Simmons made his appraisal by three different methods, each of which resulted in approximately the same valuation. One was the market data approach, which involved a consideration of sales of other property and a determination of the portion of the total sales price fairly attributable to buildings on the land. The second method was the cost approach, which was based on the cost of reproducing the buildings new as of a certain time, less accrued depreciation. Under the third method, an estimate was made of the annual net income the property would produce, and valuation was arrived at by application of a certain rate of capitalization of such income.

■ The destruction of appellant's buildings was illegal because although the Authority possessed the power of eminent domain, it did not have the power to use a declaration of taking. It wrongfully injured appellant's property rights and was bound to compensate her for the loss sustained.

■ Since appellant's buildings cannot as a practical matter be restored, the only method of compensating her for the major portion of the loss is to allow her the money equivalent of the destroyed property. This is measured by the value of the buildings. In ascertaining the value, there are no set rules or arbitrary formula that must be followed. But there must be a reasonable judgment having its basis in a proper consideration of all relevant facts.[3]

■ The criteria adopted by the court below was fair market value, estimated in the main part by considering prices paid for eighteen other parcels of property purchased by the Authority in connection with the urban renewal project. This comparative sales or market data approach may be a generally acceptable method of ascertaining value. But it is not appropriate in a case like this where the data used for comparison consists of amounts paid by a corporation possessed of the power of eminent domain for land subject to condemnation.[4] A concept of fair market value presupposes a voluntary sale in the open market, with reasonable time allowed to find an informed purchaser.[5] These elements are not present here. When sales are made to a corpora-

3. Standard Oil Co. of New Jersey v. Southern Pacific Co., 268 U.S. 146, 156, 45 S.Ct. 465, 69 L.Ed. 890, 895 (1925).

4. Even in eminent domain proceedings the weight of authority clearly is that evidence of the price paid by the same or another condemning agency for other land that, although subject to condemnation, was sold by the owner without the intervention of eminent domain proceedings, is inadmissible to show the value of the land sought to be condemned. California Law Revision Commission, Recommendation and Study relating to Evidence in Eminent Domain Proceedings A-38 (Oct. 1960); 5 Nichols, Eminent Domain § 21.33 (3d ed. 1952); Annot., 174 A.L.R. 386, 395 (1948), 118 A.L.R. 869, 893 (1939).

5. There are many definitions of market value, the one most generally used being "the price that can be obtained under fair conditions as between a willing buyer and a willing seller when neither is acting under necessity, compulsion, or peculiar and special circumstances." Maher .v. Commonwealth, 291 Mass. 343, 197 N.E. 78, 81 (1935). A good definition of market value is that given by the California Supreme Court: "the highest price estimated in terms of money which the land would bring if exposed for sale in the open market, with reasonable time allowed in which to find a purchaser, buying with knowledge of all of the uses and purposes to which it was adapted and for which it was capable." Sacramento So. R. R. Co. v. Heilbron, 156 Cal. 408, 104 P. 979, 980 (1909).

tion which will exercise its power of condemnation if it cannot acquire the property at a satisfactory price, it can hardly be said that the sales took place in the open market or that they were in the true sense voluntary and made by a willing seller.[6] We hold that evidence of prices paid by the Authority for the property in the urban renewal area was not a fair test of the value of appellant's buildings. The court's determination of value, made on that basis, was not a proper measure of compensation for the loss sustained.

■ If this were the only evidence available, we would remand the case for a new trial. But this is not required, because there are other facts from which value can be fairly ascertained. An appropriate method of determining the value of buildings that have been destroyed is to compute their replacement cost as of the date of valuation and subtract from that a sum fairly representing diminution in value by reason of depreciation.[7] Through the testimony of appellant and the Authority's witnesses, it was established that the replacement cost of the two buildings was about $45,000. The testimony of the witness Simmons was the most detailed as to the amount of depreciation that should be taken into account. He assigned a rate of 49% for physical depreciation and functional obsolescence, resulting from the age of the buildings and the materials and workmanship involved in their construction. He then added another 21% (for a total depreciation of 70%) which he said represented economic obsolescence arising from the fact that the land in the particular area was increasing in value. His theory was that because of the change in character of the area, appellant's buildings (which had been used in part as rental units) would produce less and less income as time went on, and that in period of from ten to fifteen years would have become a detriment to the land.

■ Appellant does not take issue with the amount of depreciation allowed by reason of the age and condition of the buildings. But she does protest the additional factor representing economic obsolescence. In this, we are in accord. A consideration of what income the buildings are likely to produce in the future may be a factor that enters into a determination of fair market value, because it contemplates a purchaser buying with knowledge of all the uses and purposes to which the property is adapted and for which it is capable.[8] But as we have indicated earlier, fair market value also contemplates a sale on the open market by one who wishes to sell his property. That was not appellant's position. If she could be characterized at all as a seller, she certainly wasn't a willing one. Her property was destroyed, without her consent, against her wishes, and without legal justification. She is entitled to the money equivalent of that property—that is, the amount necessary to purchase or construct comparable buildings. It is with ill grace that the Authority, which wrongfully invaded her property rights, now argues that she is not entitled to that much money because of the possibility that she would not have been able to derive any substantial income from the property in a period of ten to fifteen years. She deserves to have what it would take to replace the buildings, considering their age and physical condition. What use she may have made of them had they not been destroyed has nothing to do with restoring her to the position she occupied before the trespass occurred. We shall not permit a wrongdoer to speculate to its benefit, and to the detriment of the injured party, that buildings may not have had any future income-producing value to the injured party had the wrongdoer not destroyed them. This would not be just.

■ Based upon a replacement cost of $45,000 and an over-all depreciation rate

6. Coos Bay Logging Co. v. Barclay, 159 Or. 272, 79 P.2d 672, 680 (1938).

7. Cameron, Joyce & Co. v. McLouth, 70 F.2d 6, 7–8 (7th Cir. 1934).

8. Sacramento So. R. R. Co. v. Heilbron, 156 Cal. 408, 104 P. 979, 980 (1909).

of 70%, the value of the buildings amounted to $13,500. This should be modified by adding the additional sum of $9,450, representing the amount deducted from the total cost figure by reason of an erroneous allowance of 21% depreciation for economic obsolescence. The compensation to which appellant is entitled as the value of the destroyed buildings is $22,950.

### 2. Loss of Income.

■ Appellant also claims that the court erred in refusing to allow her compensation for loss of rental income from her property. The court had found that she failed to prove this item of damage.

Appellant's evidence on this point was indeed meager. One witness testified that for approximately one year in 1957 and 1958 he had rented one of the buildings for $125 a month. Another witness said that when she had lived in the other building in 1947, and again in 1954, the rent for the upstairs apartment was $150 a month and for the downstairs apartment, $125 a month. Appellant gave her opinion as to the rental value of the building. But she produced no evidence of income that she was actually receiving immediately prior to the destruction of her buildings, or of the likelihood that she would have continued to receive a designated amount of income had the buildings not been destroyed, or of what expenses were involved in operating the rental units. The trial court was correct in finding there was a failure to prove loss of income.

### 3. Inconvenience and Mental Anguish.

■ After reviewing appellant's evidence, the trial judge concluded that she was entitled to recover $500 damages for inconvenience, as well as mental anguish, including humiliation and embarrassment. Appellant claims this was grossly inadequate. But she gives no reasons for this assertion beyond making the assertion itself. She cites no authorities and points to no evidence from which we might conclude

that the court's award was unjust. We find no error here.

### 4. Attorney's Fees for Previous Litigation.

■ As additional damages arising from the Authority's trespass, appellant asks for a reasonable sum representing attorney's fees for previous litigation. The trial court denied recovery.

The previous litigation involved the Authority's complaint in condemnation and its declaration of taking which were filed in the former Territorial district court on June 9, 1958. Appellant retained counsel to represent her, and he promptly moved to dismiss the action and to strike the declaration of taking. The motion was denied by the district judge on August 23, 1958, and he ordered appellant to give possession of her property to the Authority not later than October 2, 1958. A motion to set aside the order granting possession was denied February 10, 1959. On March 30, 1959, the district court issued the Authority a writ of assistance in aid of the previous order granting possession. Counsel for appellant moved to quash the writ. The court denied the motion on April 28, 1959, but in doing so made a certification which authorized the federal court of appeals to permit an appeal to be taken from the district court's interlocutory order.[9]

Thereafter, appellant requested the Court of Appeals for the Ninth Circuit for leave to appeal from the order denying her motion to quash the writ of assistance, and at the same time obtained from the district court a stay of the writ pending decision by the appellate court. On May 7, 1959, the Court of Appeals denied the application to appeal, and the district court then ordered that appellant's motion for a further stay of writ of assistance be denied. On June 2, 1959, the Court of Appeals granted leave to file a petition for a writ of prohibition, and pending determination of that petition, stayed all further proceedings in the district court. On August 18, 1959, the appellate

9.  28 U.S.C.A. § 1292(b) (Supp.1962).

court denied the petition for a writ of prohibition on the basis of lack of jurisdiction, and vacated the stay previously granted.[10] On October 6, 1959, it denied appellant's petition for rehearing and her request that the court certify to the United States Supreme Court the question of appellate jurisdiction. A petition for a writ of certiorari was filed with the United States Supreme Court in December 1959, and this was denied on February 23, 1960.[11]

On October 5, 1959, the day prior to the last action by the Court of Appeals for the Ninth Circuit, we promulgated the rules of this court and assumed our appellate jurisdiction. On November 18, 1959, appellant filed with this court a petition seeking review of the actions of the territorial district court. We granted the petition and sustained the contention that had been advanced and urged by appellant throughout this controversy by holding that the Authority did not have the power to use a declaration of taking.[12] Again the matter was brought before us by appellant in April 1960, and we again sustained her position and ordered that the condemnation action be dismissed.[13]

This extensive history of the previous action is noted for the purpose of indicating the protracted nature of the litigation, the substantial questions that were involved, and the considerable amount of time and effort required of appellant's counsel in representing her interests. The value of his services is no small item of expense that was incurred by appellant in ultimately vindicating her rights. Experienced Alaska counsel who were called as witnesses by the appellant testified that the value of the legal services rendered was between $14,000 and $15,000. We believe the trial court was mistaken in failing to make an allowance for this item of claimed damages. This was an expense incurred by appellant out of reasonable necessity in an effort to seek protection against a wrongful invasion of her property rights. It was a compensable loss sustained by her as a direct result of the Authority's unlawful trespass. To not permit recovery of compensation for this loss would tend to constrain a property owner to stand idly by while his property was being destroyed, and to encourage a wrongdoer to encroach upon and invade another's property rights with impunity.

The case will be remanded with directions to the trial court to realistically assess fair attorney's fees for each of the proceedings in the previous litigation mentioned in this opinion, making allowance for the one fee of $600 awarded by this court in the case of Bridges v. Alaska Housing Authority, File No. 16, 349 P.2d 149 (Alaska 1959).

5. *Punitive Damages.*

The trial judge denied recovery for punitive damages. He held that in order to justify and sustain such an award, it was necessary to show that the action by the Authority or its officers in destroying appellant's buildings was willful, outrageous, wanton, malicious or reckless. He found that this had not been established by evidence produced by appellant.

10. Bridges v. Forbes, 269 F.2d 703 (9th Cir. 1959), cert. denied, 361 U.S. 964, 80 S.Ct. 592, 4 L.Ed.2d 544 (1960). The authority for the court's action in holding it had no jurisdiction was its previous decision in Parker v. McCarrey, 268 F. 2d 907 (9th Cir. 1959). It was held there that after Alaska became a state on January 3, 1959, the court of appeals had jurisdiction only with respect to appeals from the newly created United States district court for the district of Alaska, and not from the territorial district court which continued to act as an interim transition court pending organization of the constitutional state court system. See Hobbs v. State, Opinion No. 26, 359 P.2d 956 (Alaska), cert. denied, 367 U.S. 909, 81 S.Ct. 1923, 6 L.Ed.2d 1250 (1961).

11. Bridges v. Forbes, 361 U.S. 964, 80 S.Ct. 592, 4 L.Ed.2d 544 (1960).

12. Bridges v. Alaska Housing Authority, Opinion No. 1, 349 P.2d 149 (Alaska 1959).

13. Bridges v. Alaska Housing Authority, Opinion No. 8, 352 P.2d 1118 (Alaska 1960).

Punitive or exemplary damages are those awarded in excess of actual loss where the wrongdoer's conduct can be characterized as outrageous, such as acts done with malice or bad motives or a reckless indifference to the interests of another.[14] Whether or not they should be allowed is discretionary with the trier of fact.[15] Only if there is a clear abuse of discretion, will we reverse the trial judge's determination that no punitive damages should be awarded.

In demolishing appellant's buildings, the Authority had proceeded under a writ of assistance issued by the district judge which authorized it to take full possession of appellant's property. It may be true that at the time the buildings were destroyed on May 18, 1959, the Authority was aware of appellant's efforts to obtain leave from the court of appeals to file a petition for writ of prohibition. But on May 7, 1959, the district court had denied appellant's motion for any further stay of the writ of assistance, and the minutes of the court for that day reflect that appellant's counsel notified the court he had advised his client to vacate the premises. A further stay of proceedings was not entered until June 2, 1959—two weeks after the buildings had been destroyed—when the appellate court granted leave to appellant to file the petition for a writ of prohibition.

In these circumstances the trial judge could reasonably have been convinced that the officers of the Authority responsible for the destruction of appellant's buildings were not actuated by malice or other bad motives or by a reckless indifference to appellant's rights. We find no abuse of discretion in the judge's decision not to award punitive damages.

### 6. *Immunity of Officers of Authority.*

The appellees, Gebhart and Gagnon, were officers of the Alaska Housing Authority. Gebhart was its general administrative head, and Gagnon was manager of the urban renewal project in charge of acquisition of property, and the person who ordered that appellant's buildings be demolished. Appellant sought to impose personal liability upon these officers for the damages to which she was entitled, but the trial court held they were immune from suit.

The Alaska Housing Authority is a public corporate authority created for the purpose of undertaking slum clearance and providing low cost housing projects.[16] Because it exists and functions only for the purpose of serving a public need, its officers, Gebhart and Gagnon, fall within the classification of public officers. In this capacity, and within the scope of their official duties, they exercised their discretionary power in causing appellant's land to be taken and her buildings to be destroyed. They are immune from civil liability for this action under the well recognized rule that affords such protection to a public officer, acting within the scope of his official duties, for damages caused by a mistake by him in the exercise of judgment or discretion, or because of an erroneous interpretation and application of the law.[17] The trial court committed no error in holding these appellees immune from suit.

14. Restatement, Torts § 908 (1939); Scott v. Donald, 165 U.S. 58, 86–89, 17 S.Ct. 265, 41 L.Ed. 632, 637–639 (1897); Prosser, Torts § 2, at 9–10 (2d ed. 1955).

15. Restatement, Torts § 908(2) (1939); Kirschbaum v. Lowrey, 165 Minn. 233, 206 N.W. 171, 173 (1925); McCormick, Damages § 84 (1935); Prosser, Torts § 2, at 11 (2d ed. 1955).

16. Section 40–7–1, 2 A.C.L.A.1949, as amended S.L.A.1949, ch. 8, § 1 [40–7–1 A.C.L.A.Cum.Supp.1957]. Urban renewal projects were added S.L.A.1955, ch. 184, § 1 [§ 40–7A–22 A.C.L.A.Cum.Supp. 1957].

17. Cooper v. O'Connor, 69 App.D.C. 100, 99 F.2d 135, 138, 118 A.L.R. 1440, cert. denied, 305 U.S. 643, 59 S.Ct. 146, 83 L. Ed. 414–415 (1938); Baker v. Mueller, 222 F.2d 180, 183 (7th Cir. 1955); Prosser, Torts § 109, at 780–781 (2d ed. 1955); 3 Davis, Administrative Law § 26.01 (1958).

The case is remanded with directions to the trial court to modify the judgment as follows:

1. Change the amount appellant is entitled to recover for the value of her destroyed buildings from $13,400 to $22,950, and recompute interest accordingly.

2. Realistically assess and add to the judgment in appellant's favor an amount representing fair attorney's fees for each of the proceedings in the previous litigation mentioned in this opinion, making allowance for the one fee of $600 awarded by this court in the case of Bridges v. Alaska Housing Authority, File No. 16, 349 P. 2d 149 (Alaska 1959).

As so modified, the judgment is affirmed.