**CITY OF KENAI, Alaska, Appellant,**

**v.**

**William M. BURNETT, Jill Burnett and Douglas F. Jones, Stephanie Marie Jones, Stacie Marie Jones, a minor child, through her father and guardian, Douglas F. Jones, and Financial Factors, Ltd., an Alaska corporation, Appellees.**

**No. S–4282.**

Supreme Court of Alaska.

Oct. 15, 1993.

Marc D. Bond, Delaney, Wiles, Hayes, Reitman & Brubaker, Anchorage, for appellant.

Victor C. Krumm, Hickey & Krumm, Anchorage, for appellees.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS and COMPTON, JJ.

*OPINION*

BURKE, Justice.

The Burnetts brought this inverse condemnation action against the City of Kenai seeking compensation for an easement taken to build a public golf course. The superior court granted the Burnetts partial summary judgment, ruling that the City had taken a legally protected property interest and was required to pay the Burnetts just compensation. A jury later awarded the Burnetts compensation for diminution in their property's value, lost profits, and incidental damages. The City appeals, challenging both the summary judgment ruling and the damage award. We affirm in part, reverse in part, and remand the case for further proceedings.

I

There are two parcels of land involved in this case: the Burnett property and Candle-

light Extension, a segment of road that once provided access to the Burnett property. Helen Stetzer was the original owner of the Burnett property. Her husband filed a homestead application for the land with the United States Bureau of Land Management (BLM) in 1962. Mr. Stetzer died shortly thereafter. Mrs. Stetzer moved onto the property and built the road now known as Candlelight Extension in 1962.[1] The BLM granted Mrs. Stetzer a patent to the land in February 1972. The investigations done for the patent grant indicated that the BLM was aware of Candlelight Extension at the time it granted the patent.

Mrs. Stetzer died in 1973. In 1983, Mrs. Stetzer's heirs sold the Stetzer property to the Burnetts. The Burnetts planned to subdivide and develop the property. Prior to the sale, the Burnetts requested that the City grant them an express easement along Candlelight Extension. The Kenai Planning and Zoning Commission recommended that a public use easement be granted. The Burnetts then purchased the property. In August 1983, the City Council adopted Kenai Municipal Code Ordinance (KCO) 870–83 authorizing the easement, contingent upon the approval of the "appropriate federal agencies." [2]

In 1985, the City Council proposed developing an eighteen hole golf course. On June 5, 1985, the City Council approved a plan submitted by developer Richard Mor-

gan to build a golf course on land adjacent to the Burnetts' property, land which included Candlelight Extension (i.e. Lot 3). Two days later, the City agreed to lease Morgan land to develop the first nine holes of the course. The lease agreement gave Morgan a right of first refusal to lease additional lots, including Lot 3.

When Morgan informed the Burnetts of the agreement, the Burnetts immediately contacted the City regarding access to their property. In January 1987, after being advised by the city attorney of the complex legal issues involved, the City Council voted unanimously to provide the Burnetts access to their property either by preserving Candlelight Extension or by building an alternate route.[3]

In light of the City's promises to provide access, the legal status of Candlelight Extension was unclear. However, on May 25, 1987, the City leased Lot 3 to Morgan. Morgan built the second nine holes of the golf course destroying Candlelight Extension and with it access to the Burnett property. On June 17, 1987, the City Council adopted a second ordinance rescinding Ordinance 870–83.[4]

Because of the problems securing access to their property, the Burnetts could not continue with their development plans. They failed to meet their mortgage payments, and the mortgagees foreclosed. The Burnetts then brought this inverse

---

1. Candlelight Extension crosses a parcel of land originally owned by the federal government known as "Lot 3." In 1965, the federal government patented Lot 3 to the State. In 1966, the State patented it to the City of Kenai. Initially, Lot 3 was vacant land not dedicated for a particular use. However, in 1980, the City rededicated Lot 3 for recreational use only in order to resolve a dispute with the federal government. Under the agreement, the dedication could not be changed without the permission of the United States Secretary of the Interior.

2. The parties dispute whether this approval was ever competently granted. The City argues on appeal that Ordinance 870–83 was an "inchoate

grant" which "failed because the conditions precedent to the grant were never fulfilled." Brief of Appellant at 26. *See infra* Discussion Section IIA.

3. Kenai's Public Works Director and the City Engineer later estimated that the cost of constructing an alternate route would be between $250,000 and $340,000, making this option impractical.

4. The second ordinance essentially states that because the Burnetts had never "perfected" their easement, the easement never came into existence.

condemnation action.[5] In September 1989, the Burnetts moved for partial summary judgment seeking a ruling that Kenai inversely condemned their property interest in Candlelight Extension and that the date of condemnation was June 7, 1985. The City opposed the Burnetts' motion and filed its own motion for summary judgment, arguing that the Burnetts' claim was barred by the statute of limitations. The City also filed a Civil Rule 56(f) motion for a six-month time extension to oppose the Burnetts' motion for summary judgment. The trial court denied the City's motions and granted the Burnetts' motion. The trial court ruled that the Burnetts had an easement via Candlelight Extension which was taken as a result of the City's first lease to Morgan on June 7, 1985.[6]

A trial was then scheduled to ascertain just compensation for the taking. A few days prior to trial, the City moved for partial summary judgment seeking a legal ruling that the proper measure of damages was the lesser amount of 1) the cost to restore reasonable access to the Burnett property or 2) the diminished value of the property due to the loss of access. With its motion, the City filed an affidavit from Philip Bryson, an engineer, who claimed that the cost of constructing alternative access along the Burnetts' section line easement was $147,974. The Burnetts opposed this motion and requested that Bryson's report on the cost of alternate road construction be excluded from the evidence

presented at trial. The trial judge heard argument and ruled that Bryson's testimony and report was to be stricken. However, at this time, the trial judge did not rule on the proper measure of damages to be used at trial.

When the trial began, both sides presented expert witnesses who appraised the Burnett property (i.e. the property remaining with the Burnetts after Candlelight Extension was destroyed) using a "before and after" fair market valuation approach. Kenneth Gain, the Burnetts' valuation expert, calculated the fair market value of the property using a comparable sales appraisal method, a prior sales price method, and a subdivision development method.[7] He came up with a "before" (i.e. with access) fair market value of $227,500 using comparable sales, $224,400 using the prior sales price, and $240,000 using the subdivision approach. Gain combined these figures using an imprecise formula and arrived at a fair market value of $235,000 for the property with access as of June 7, 1985.

Next, Gain calculated the fair market value of the Burnett property without road access as well as the "cost to cure" the land (i.e. replace the lost access road). Gain determined that the cost of providing comparable access was between $300,000 and $360,000[8] and noted that it was not economically feasible to build a new road because the cost was greater than the value of the land. Therefore, Gain concluded

5. The Joneses and Financial Factors, Ltd. also brought claims as mortgagees. All the claims were consolidated in April 1989.

6. Specifically, the court ruled that no material issues of fact existed and that 1) Stetzer had a "vested easement implied by quasi-easement" to use Candlelight Extension as access to her homestead (i.e. an implied easement); 2) the Burnetts had an easement by necessity; and 3) the Burnetts had an express easement pursuant to Ordinance 870–83.

7. The "comparable sales" and "prior sale price" valuations are variations of the "market data" valuation method. *See Dash v. State,* 491 P.2d 1069 (Alaska 1971). Under the prior sales price approach, Gain explicitly relied on the "com-

mon knowledge" that the City planned to construct a golf course in the vicinity of the Burnetts' property to elevate the market value of the property. It also appears that Gain included the increase in value which comes from property being located near a golf course under all three approaches. This is made clear from the fact that many of the "comparable properties" Gain used in his appraisal were located on or near a golf course.

8. In arriving at this figure, it appears that Gain relied almost exclusively on the reports of the City Engineer and the Director of Public Works that the cost of constructing alternative access would run between $250,000–$340,000.

that a subdivision could not be feasibly built and that the property's "highest and best use" had been reduced to that of a "speculative recreational property." Gain noted the difficulty of finding "comparable sales" to appraise the property without access because the other properties he had considered all had some means of present access or, at least, an economically feasible way of providing access. However, using a per acre price for the raw land, he determined that the "after taking" value of the property, the value of recreational land with no access, was $55,000. He testified that the diminished value of the land resulting from the taking was $180,000 ($235,000 minus $55,000).

Fred Ferrera, the City's valuation expert, also performed a "with and without access" valuation of the Burnett property using a comparable sales appraisal method and a subdivision development method.[9] Using the comparable sales method, Ferrera estimated that the property had a fair market value of $144,000 with access as of June 1985. Using the subdivision approach, he testified that it had a value of $132,000. Ferrera then testified that the "without access" fair market value of the property on the takings date was $75,000.

The trial judge instructed the jury to compensate the Burnetts for the "taking" of the road access easement. He defined just compensation as "the fair market value of the property being taken as of June 7, 1985 plus all damages that have directly resulted." When these instructions are read in conjunction with the special verdict form, it appears that the trial judge intended the jury to award the Burnetts the amount that the taking of access diminished the fair market value of the Burnetts' remaining property. The judge asked the jury to determine the fair market value of the Burnett property as of June 7, 1985 with and without road access.

9. The City wanted Ferrera to testify that the subdivision development appraisal showed that the development costs outweighed projected profits on the proposed development. Howev-

The trial judge also instructed the jury to determine whether it was reasonably possible to construct an alternate access road and, if so, to determine the cost of construction. The instructions did not make it clear whether the Burnetts were entitled to receive either the "fair market value" amount or the "cost to cure" amount, the lesser of the two, or both. The trial judge also instructed the jury that it "must include any increase in the market value of the property caused by the proposed golf course that occurred before June 7, 1985" but should consider no increase due to the golf course after that date.

The jury answered the special verdict listing a "with and without access" diminished value amount of $159,400 and a "cost to cure" amount of $435,000. Although the special verdict form did not indicate which amount represented the actual award, the final judgment indicates that the court used the diminished value figure. The jury also awarded the Burnetts $100,000 in lost profits and $48,628 for "other damages." In addition, the trial court awarded over $179,000 in attorney's fees to the Burnetts and the mortgagees. This appeal followed.

## II

### A. Inverse Condemnation

◾ Article 1, section 18 of the Alaska Constitution provides that "[p]rivate property shall not be taken or damaged for public use without just compensation." A property owner may recover damages through an inverse condemnation action where the State physically invades private property without instituting formal eminent domain proceedings or otherwise employs land use planning regulations which deprive a property owner of the "economic advantages of ownership." *Ehrlander v. State, Dep't of Transp.*, 797 P.2d 629, 632–

er, the trial judge excluded that testimony because he found that it was based on data that was not reasonably relied upon by experts in the field.

33 (Alaska 1990) (quoting *Homeward Bound, Inc. v. Anchorage School Dist.*, 791 P.2d 610, 614 (Alaska 1990)).

As noted above, the trial court ruled on partial summary judgment that a compensable taking had occurred. In reviewing an award of summary judgment, we independently determine whether any genuine issues of material fact exist and whether the moving party is entitled to judgment as a matter of law. *Drake v. Hosley*, 713 P.2d 1203, 1205 (Alaska 1986).

1. *The Ruling on Summary Judgment that the Burnetts Owned a Property Interest in Candlelight Extension*

The first question presented is whether the Burnetts established their ownership of a property interest in Candlelight Extension. Although the trial court ruled that the Burnetts obtained easements over Candlelight Extension both by implication and by necessity, it is plainly wrong to apply either legal theory to the facts of this case.

We have focused, therefore, on the argument that the City granted the Burnetts an express easement via Candlelight Extension when it passed Ordinance 870–83. The ordinance provided that

[a] sixty foot public easement be established along Candlelight Drive Extension through City-owned lands described as

Government Lot 3, Section 3, T5N, R11W, S.M., *subject to permission from appropriate federal agencies.* Furthermore, the City shall not assume responsibility for the upgrading and maintenance of said easement unless authorized by the Council, nor costs of perfecting this easement.

KCO 870–83 (emphasis added). The ordinance required federal approval of the easement pursuant to 16 U.S.C. § 460*l*–8(f)(3) (1982).[10]

In their motion for summary judgment, the Burnetts argued that the National Park Service delegated its authority to approve the easement to the State, and that the State approved the easement in April 1984. The superior court apparently accepted this claim based on the documentation offered in support of the Burnetts' motion. The court ruled that the express easement granted by ordinance 870–83 was a "vested" property interest owned by the Burnetts which was "taken" by the City.

The four justices participating in today's decision are evenly divided on whether the superior court ruled correctly, when it granted the Burnetts' motion for summary judgment.[11] The lower court's ruling is, therefore, affirmed. Since we are deadlocked on this issue, we decline to express our individual reasons for affirmance or reversal in this, the opinion of the court.[12] *See Taylor Const. Serv., Inc. v. URS Co.*, 758 P.2d 99, 103 (Alaska 1988).

---

**10.** Prior to 1986, 16 U.S.C. § 460*l*–8(f)(3) provided that

(3) No property acquired or developed with assistance under this section shall, without the approval of the Secretary, be converted to other than public outdoor recreation uses. The Secretary shall approve such conversion only if he finds it to be in accord with the then existing comprehensive statewide outdoor recreation plan and only upon such conditions as he deems necessary to assure the substitution of other recreation properties of at least equal fair market value and of reasonably equivalent usefulness and location.

**11.** Justices Matthews and Compton would affirm the trial court's grant of summary judgment as proper; Justice Rabinowitz and the author of this opinion, writing for the court,

would reverse the lower court's ruling as erroneous. This particular issue of law, therefore, remains undecided; the ruling below is affirmed, however, because "that which has been done [by the lower court] must stand unless reversed by the affirmative action of a majority." *Hertz v. Woodman*, 218 U.S. 205, 212, 30 S.Ct. 621, 622, 54 L.Ed. 1001 (1910).

**12.** The author of this opinion elects not to express his individual views here or in a separate opinion. Like Justice Compton, who concurs separately, the author believes his individual views on the merits of this issue are immaterial, since those views relate to a matter which remains undecided in this appeal. *See Etting v. Bank of United States*, 24 U.S. 59, 11 Wheat 59, 6 L.Ed. 419 (1826).

## 2. The Superior Court Erred in Ruling that the Taking Occurred on June 7, 1985

 The trial court also ruled on summary judgment that the taking occurred when the first lease was executed on June 7, 1985. The first lease agreement between the City and Morgan covered Lots 1 and 2 and was entered for the purpose of building the first nine holes of an 18–hole golf course. The lease contained an additional provision granting Morgan a right of first refusal to lease Lot 3 and parts of Lot 4 for the second nine holes. The City argues that the first lease does not constitute a taking because Morgan could not force the City to lease Lot 3.[13] It further argues that Candlelight Extension was not directly affected by the first lease and that the Burnetts' property rights were therefore undisturbed. We agree.

 A taking does not occur until legal title to property vests in the government, or the government takes actual or constructive possession of the property. *Stewart & Grindle, Inc. v. State*, 524 P.2d 1242, 1246 (Alaska 1974). The government takes constructive possession either by causing damage to the property or by depriving the owner of the full, beneficial use of the land. *Id.* We have applied a four-part test to determine whether a government agency's declared intent to condemn land at some future date is sufficient to deprive landowners of the full, beneficial use of their land. We consider the following questions: (1) Is the land's marketability substantially impaired? (2) Has the condemning authority evidenced an unequivocal intention to take the specific parcel of land? (3) Has the owner acquired and held the property for subsequent development and sale? and (4) Has the owner taken active steps to accomplish this purpose? *See Ehrlander*, 797 P.2d at 634; *see also Homeward Bound*, 791 P.2d at 614 (holding that no taking occurred because the Municipality's "mere designation of the property as a school site was not a concrete indication that the Municipality intended to condemn the property").

In this case, we find nothing in the record to show that the Burnetts were stymied in their development plans as of June 7, 1985. Furthermore, the City did not demonstrate an "unequivocal intention" to take the easement when it executed the first lease. A right of first refusal is not an option, and the granting of such a right is insufficient proof of the City's concrete intention to lease Lot 3. Even if we accept that the City would inevitably lease Lot 3 to Morgan in order to complete the golf course, the course's construction would not necessarily entail the destruction of Candlelight Extension. Many golf courses have roads running through them, and the City Council actually discussed such a possibility in the present case.

For the above reasons, we conclude that trial court erred in ruling on summary judgment that the City took constructive possession of the property when it granted Morgan the right of first refusal. The taking occurred when it became clear that Candlelight Extension was slated for destruction. There remains a question of fact as to when this occurred, but in light of the City's January 7, 1987 resolution

---

**13.** The City also argues that if the taking occurred on June 7, 1985, the Burnetts' claim should be barred as untimely. We find no merit in the City's argument, principally because it ignores our prior case law. In *City of Anchorage v. Nesbett*, 530 P.2d 1324, 1336 (Alaska 1975), we rejected an argument that inverse condemnation actions may be time barred either through laches or a limitations period shorter than the statutory period provided for adverse possession. We reaffirm our holding in *Nesbett* that such actions are subject to the limitations periods established for adverse possession or ejectment, whichever applies. Under AS 09.10.030, the limitations period for ejectment is ten years. Under AS 09.25.050, a seven year period applies when the adverse possessor acquires possession "under color and claim of title." The taking in this case occurred no earlier than 1985. The Burnetts filed their inverse condemnation action in October 1988. Thus, under either of these statutes, the Burnetts' claim was not time barred.

guaranteeing the Burnetts' access to the land, it would be difficult to place the date of the taking before passage of the resolution. The trial court's partial summary judgment order establishing the date of the taking as June 7, 1985 is reversed and the case is remanded for further proceedings conforming to this opinion.

### B. Compensation for the Taking of the Easement [14]

The City's principal argument is that the damage instructions given to the jury blurred the distinction between compensation for the property actually taken (i.e. the access easement) and compensation for the "severance damage" to the Burnetts' remaining property. The City also claims the court erred in denying its requested ruling that the maximum damages available to the Burnetts was equal to the cost of obtaining access to the Burnett property.

### 1. The "Before and After" Fair Market Value Measure of Damages

■ The first issue we decide is the proper measure of damages to be applied in this case. In our view, this case presents a "loss of access/taking of an easement" situation rather than a "partial taking/severance" situation so the proper statutory measure of damages is AS 09.55.310(a)(1).[15]

This statute requires the jury to "value the property sought to be condemned," in this case the access easement. The proper way to value an easement, as reflected in Alaska Pattern Civil Jury Instruction 27.07, is "to compute the drop in fair market value" of the property affected.[16] In other words, the jury should perform a "before and after" fair market valuation of the remaining Burnett property. See State v. Doyle, 735 P.2d 733, 735 (Alaska 1987) (proper measure of damages for the taking of an avigation easement is "the difference in the fair market value of the property before and after the taking"); see also 0.958 Acres v. State, 762 P.2d 96, 101 n. 8 (Alaska 1988) (citing the "before and after" method as the proper damage measure in a loss of access case).

Although we agree with the City that the jury instructions were not entirely clear on this issue, the special verdict form required the jurors to value the Burnett property with and without access on the takings date established by the trial court. Under our case law, this was a proper method to compensate the Burnetts for the taking of the easement itself.[17]

### 2. The "Cost to Cure" Measure of Damage

■ The next question is whether the replacement value or "cost to cure" mea-

**14.** Because the jury's "just compensation" award was based on an erroneous takings date, the award cannot stand. However, we have decided to address the important damages issues raised by the parties in order to provide guidance to the trial court on remand.

**15.** We recognize that AS 09.55.310(a) concerns the calculation of damages in a formal eminent domain proceeding whereas this case is an inverse condemnation action. However, we have long recognized that where a taking has occurred and the issue is the awarding of just compensation, "such compensation may be determined [in an inverse condemnation action] utilizing so far as is practicable the statutory requirements and procedural steps" set out for eminent domain proceedings. State, Dep't of Highways v. Crosby, 410 P.2d 724, 728 (Alaska 1966); see also, Williams v. City of Valdez, 603 P.2d 483, 494 (Alaska 1979).

**16.** In this case the City destroyed the Burnetts' easement, whereas, in the typical situation and the one the pattern jury instruction contem-

plates, the converse occurs and the condemning authority imposes an easement on the property owner's land. See, e.g., Wickwire v. City & Borough of Juneau, 557 P.2d 783 (Alaska 1976). However, whether an easement is imposed or destroyed is not significant in determining the value of the easement. In the first case, the servient estate is burdened which results in a diminution in the estate's fair market value. In the second case, the dominant estate loses its benefit which also results in a diminution in the estate's fair market value.

**17.** The City also argues that trial court erred in giving Jury Instruction 16 which stated that "Article I, Section 18 of the Alaska Constitution is to be liberally construed in favor of the property owner." The sufficiency of "jury instructions is a question of law upon which we will exercise our independent judgment." Fairbanks North Star Borough v. Kandik Constr., Inc., 795 P.2d 793, 797 (Alaska 1990). We agree with the City that, although this instruction is a correct statement of the law, it is an improper jury instruction. As the City points out, the instruc-

sure of damages should be given as an alternative measure of damages for the taking and whether the jury must be restricted to awarding the lesser of the two damage figures.

In Alaska, the fundamental goal of "just compensation" is to make the property owner whole. *Hammer v. State*, 550 P.2d 820, 826 (Alaska 1976). A fair market valuation is only one way to accomplish this task, and other damage measures may be used when the fair market value measure would not be adequate to make the property owner whole. *See Gackstetter v. State*, 618 P.2d 564, 567 (Alaska 1980) ("fair market value is not an end in itself, but merely a means to achieve the goal of just compensation"); *Bridges v. Alaska Housing Auth.*, 375 P.2d 696, 698–99 (Alaska 1962) (rejecting a fair market value measure of damages and approving a replacement cost measure in an unusual situation in which fair market value did not adequately compensate an owner for the damage done to her building). However, we have expressed a preference for a fair market valuation over a replacement or reproduction cost valuation "in cases where the property is of a type ordinarily bought and sold in a ready market." *Ketchikan Cold Storage Co. v. State*, 491 P.2d 143, 151 n. 12 (Alaska 1971).[18] Thus, we see no reason why an alternative "cost to cure" instruction need be given in the absence of a showing by the City that "fair market value" is an inaccurate measure of the losses suffered by the Burnetts.

 It also is plainly wrong to claim, as the City does, that the maximum damages available to the Burnetts should be "equal to the cost of obtaining access to the subject property." Such a limit may have been proper if there had been no interruption in access to the Burnetts' property or if it was clear at the time of the taking that under their duty to mitigate damages, the Burnetts were required to construct alternate access and continue with their development plans. If that were the case, it could be said that reimbursement for the cost of putting in an alternate access route was sufficient to make the Burnetts whole.

However, at the time of the taking in this case, the City's own engineers determined that the cost of constructing alternate access would run between $250,000 and $340,000. At this price, development of the subdivision was no longer economically feasible. The loss of access brought subdivision development to a halt and eventually led to the foreclosure of the property. Simply requiring the City to pay the cost of constructing an alternate access road at this late stage would not make the Burnetts whole in any sense of the word.

### 3. The Impact of the Golf Course on Fair Market Value

 The final issue we will address relating to damages for the taking is the extent to which the jury may consider the value-enhancing impact of the planned golf course in determining the "before" fair market value of the Burnett property. The trial judge instructed the jury that it "must include any increase in the market value of the property caused by the proposed golf course" that occurred before the takings date but could not consider the impact of the golf course on fair market value after that date.

The City claims that this instruction was erroneous. It relies on *State v. Alaska Continental Dev. Corp.*, 630 P.2d 977, 983 (Alaska 1980), where we stated that the "inclusion of value enhancement attributable to the project for which the property is

---

tion may induce a jury to be liberal in their award of damages.

**18.** *See generally* Roland F. Chase, Annotation, *Measure of Damages for Limitation of Access Caused by Conversion of Conventional Road into Limited–Access Highway,* 42 A.L.R.3d 148, 156

(1972) ("in unusual situations, where it is not possible to ascertain the loss in market value due to the cutting off of access rights ..., damages may be measured by the cost of constructing substitute means of access").

being taken is generally prohibited in determining condemnation awards." The Burnetts argue that they are entitled to compensation for increased value resulting from the general knowledge that a golf course was planned up to the date the project was chosen. Although the briefing on this issue is quite inadequate, it appears that the parties are disputing the proper application of the "scope of the project" and "indefinite location" rules to the facts of their case.

In *Alaska Continental Dev.*, we approved of the so-called "indefinite location" rule, stating that "value resulting from the general knowledge that the project was planned was proper to consider *up to the date the route was chosen that would take [the owner's parcel]*." *Id.* at 984–85 (emphasis added). In *City of Valdez v. 18.99 Acres*, 686 P.2d 682 (Alaska 1984), we stated that,

> the proper time to exclude project-enhanced value from a fact-finders' calculations *is when the property is likely to be condemned* and its market value thus reflects the owner's chance to "hold up" the government which is planning to take it. *Until then, project-enhanced value is compensable.*

*Id.* at 689 (emphasis added).

■ The "scope of the project" rule which we have adopted has two components. First, if the land is "probably within the scope of the governmental project for which it is being condemned *at the time the Government became committed to the project*, then the owner is not entitled to *any increment in value* occasioned by the Government's undertaking the project." *City of Valdez*, 686 P.2d at 689 (emphasis added) (quoting *United States v. 320.0 Acres of Land*, 605 F.2d 762, 781–82 (5th Cir.1979). Second, "whenever it becomes likely that the property will be condemned—whether or not the property was originally within the project's scope—project-enhanced value ceases to be compensable." *City of Valdez*, 686 P.2d at 689.

As noted in our discussion of the takings date, the record is clear that the City did not envision the destruction of Candlelight Extension when "it became committed" to building a municipal golf course. Thus, the first part of the "scope of the project" rule does not apply, and the Burnetts are likely entitled to *some* project-enhanced value as a result of the "general knowledge" that the City planned to build a golf course in the vicinity of their property. The factual issue to be resolved on remand is the date that value enhancement due to the golf course ceased to be compensable.

■ In *City of Valdez*, we adopted the California Supreme Court's "probability" test to determine the date upon which project-enhanced value is no longer compensable. *Id.* at 690 n. 15 (citing *Merced Irrigation Dist. v. Woolstenhulme*, 4 Cal.3d 478, 93 Cal.Rptr. 833, 483 P.2d 1, 12–13 (1971) (en banc)). Under the test, project-enhanced value is excluded from just compensation when "an informed owner could reasonably anticipate that the property might well be taken for the project." *Woolstenhulme*, 4 Cal.3d 478, 93 Cal.Rptr. 833, 483 P.2d at 13 n. 10. If the Burnetts are able to establish their ownership of the Candlelight Extension easement on remand, the jury should be instructed to apply the probability test to determine the date on which the golf course project may no longer enhance the "before" fair market value of the Burnett property.

### C. Compensation for the Consequences of the Taking

In addition to the loss of the easement, other negative consequences flowed from the elimination of the Burnetts' access to their property. The loss of access made it unfeasible for the Burnetts to complete their planned subdivision, and they ultimately lost the property through foreclosure. The Burnetts therefore also sought compensation for lost profits and other incidental damages resulting from the taking.

### 1. Lost Profits

■■■ At the close of the Burnetts' case, the City moved for a directed verdict on the issue of lost profit damages. The City argued that the evidence showed that the Burnett's planned subdivision was not sufficiently developed to provide assurances of lost profits and that they had, therefore, failed to prove this item of special damages with reasonable certainty. The trial court denied the City's motion, ruling that there was sufficient proof to allow reasonable jurors to differ on this issue. The jury ultimately awarded the Burnetts $100,000 in lost profits and $48,628 for other incidental expenses. The City now challenges the denial of its directed verdict motion arguing that the Burnetts are not entitled to lost profits as a matter of law.

Although courts in eminent domain proceedings have traditionally refused to award damages for lost profits, we have long recognized that such damage awards may be necessary to fully indemnify the property owner for the taking. *See State v. Hammer*, 550 P.2d 820, 824–27 (Alaska 1976). In *Hammer*, we held that a business owner should be compensated for the temporary loss of profits resulting from an interruption of the business due to the state's exercise of its eminent domain powers. *Id.* at 827. We noted, however, that because "loss of profits is an item of special damages, the condemnee has the burden of proving by a preponderance of the evidence the amount of profits lost as a direct result of the state's taking, such proof must meet the requirement of reasonable certainty." *Id.* Whether lost profits are recoverable when a subdivision or other real estate project is aborted while still in the development stage is a question of first impression for this court.

The certainty required for an award of lost profits for a proposed development is illustrated in *City & County of Honolulu v. Bonded Inv. Co.*, 54 Haw. 414, 54 Haw. 385, 507 P.2d 1084 (1973). In *Bonded Inv.*, the City of Honolulu filed condemnation proceedings to acquire two parcels of beach front land (Lots 63 and 64). *Id.* 507 P.2d at 1087. Before the condemnation proceedings, the landowners did considerable work to develop the property and market the condominiums they planned to build. *Id.* Their work included a feasibility study and appraisals for financial purposes, drawings outlining the improvements to be made, satisfactory construction financing, and arrangements for the necessary legal documentation. *Id.* In addition, all the units on Lot 63 were sold and the money placed in escrow. *Id.* The Hawaii Supreme Court concluded that evidence of lost profits on Lot 63 was properly admitted because the expected profits were based on legally enforceable sales contracts and were, therefore, sufficiently certain. *Id.* 507 P.2d at 1088. In contrast, evidence of lost profits for Lot 64 was properly excluded because no sales contracts had been executed and lost profits were, therefore, too speculative and uncertain. *Id.*

In this case, Jill Burnett testified that a substantial amount of work had been performed in developing the property as a subdivision. The work, however, consisted primarily of obtaining preliminary approval for 19 lots in the subdivision and doing survey and soil tests. At best, the project was in the early stages of development. The proof establishing lost profits in this case simply does not reach the level of certainty found in *Hammer*, where there was a preexisting business with a stipulated amount of lost profits, or *Bonded Inv.*, where sales contracts provided a clear measure for projected profits. Because the Burnetts' profit projections are so highly speculative, we conclude that the Burnetts are not entitled to compensation for lost profits as a matter of law.

### 2. Incidental Damages

■■■■■ The Burnetts were also awarded compensation for certain incidental expenses relating to the taking. Like lost profits, incidental damages may be justified in takings cases so long as they are proven

with reasonable certainty. *See Hammer*, 550 P.2d at 826–27. The Burnetts' request for incidental expenses included, among other things, reimbursement for work done to improve and develop the land, for the post-taking interest they paid on their note, and for the property taxes they paid after June 1985. The jury awarded incidental damages in excess of $48,000 but did not address the claims separately. We have evaluated the claims on an individual basis.

First, we hold that the Burnetts may be compensated for expenditures they made in furtherance of their subdivision development which did not actually increase the fair market value of their land. Soil tests and land surveys would fall in this class. The limitation on this damage measure is that, like all claims for special damages, the Burnetts must prove these damages by a preponderance of the evidence and with reasonable certainty. *Id.* at 824–27.

However, the Burnetts should not be compensated, in the form of a special damage award, for the other costs of improving their land. In *Ketchikan Cold Storage Co. v. State*, 491 P.2d 143 (Alaska 1971), we held that a condemnee will not be penalized for improving his property if the improvements were made in good faith. *Id.* at 153. However, improvements to the land are normally reflected in the subsequent fair market value of the land. Kenneth Gain, the Burnetts appraiser, testified that the value of the land rose from $170,000 in 1983 to $224,000 in 1985. This figure was based on a 10% per year increase in market price and a 10% increase in value due to the development work done on the property. If the Burnetts are compensated for improvements made on the property and for the increase in market value due to those improvements, they will receive double compensation for the work done. Because improvement costs are properly reflected in market price, compensation for these costs should come in the form of an award for diminution in the property's value as a result of the taking.

■ We further hold that although the Burnetts are entitled to interest on a "just compensation" award calculated as of the date of the taking, they are not entitled to reimbursement for the post-taking property taxes or interest which they paid on their note. *See Stewart & Grindle, Inc. v. State*, 524 P.2d 1242, 1246–48 (Alaska 1974). As for the other incidental damages claims, although we believe that they were not proven with sufficient certainty to carry the Burnetts' burden of proof in the first trial, we see no reason to prevent the Burnetts from pressing these claims again on remand.

## CONCLUSION

The trial court's order for partial summary judgment, establishing that a compensable taking occurred, is affirmed by an evenly divided court. We conclude, however, that the trial court erred in ruling on summary judgment that the taking occurred on June 7, 1985. The court also erred in denying the City's motion for a directed verdict on the issue of lost profits. We reverse the award of partial summary judgment with regard to the date of the taking, and remand the case for further proceedings consistent with this opinion. We also reverse the just compensation award and remand for a new trial on damages consistent with this opinion. Finally, in light of our remand, we vacate the trial court's award of attorneys' fees.

AFFIRMED in part; REVERSED in part; and REMANDED with instructions.

MATTHEWS and COMPTON, JJ., concur.

RABINOWITZ, C.J., dissents in part.

MATTHEWS, Justice, concurring.

In my view the superior court correctly ruled that the Burnetts had a property interest in the Candlelight Extension. Because I think that appellate opinions re-

quire reasons for the conclusions reached,[1] I write separately to briefly express my reasons for this conclusion.

One condition of the ordinance which granted the Burnetts an express easement in the Candlelight Extension was that appropriate federal approval had to be received. Documents submitted in support of the Burnetts' summary judgment motion indicate that state officials informed the City that the National Park Service had delegated authority to grant approval of the easement to the State Parks Division and that the State Parks Division did in fact approve of the easement. The City assured the Burnetts on a number of occasions that it was satisfied that federal approval had been obtained and never suggested that the Burnetts should take further action to clarify whether the federal government had granted approval. The Burnetts reasonably and detrimentally relied on the City's representations concerning federal approval and it would be unconscionable at this point to allow the City to assert an inconsistent position in order to avoid compensating the Burnetts for their losses.

If this case involved the forced imposition of an easement on property subject to a federal dedication for outdoor recreational use, it would be appropriate to require direct evidence of federal approval. However, only damages are being sought in this case and only from the City of Kenai. No federal interest is involved. Therefore, it seems appropriate to hold the City to its pre-taking representations to the Burnetts that the condition regarding federal approval was satisfied.

The City also claims that even if the federal government approved the easement, the Burnetts failed to perfect their easement because they never obtained a conveyance document executed by the City Manager as required by the municipal code. In my view this argument lacks merit.

The City Council consistently recognized the Burnetts' right of access to their property and disregarded any conditions precedent that arguably might have been present in the 1983 ordinance.[2] The Burnetts reasonably and detrimentally relied on the City's representations. It would be unconscionable therefore to allow the City to now assert an inconsistent position to avoid compensating the Burnetts for their losses. *Sea Lion Corp. v. Air Logistics of Alaska,* 787 P.2d 109, 114 n. 2 (Alaska 1990) (the doctrine of quasi-estoppel "precludes a party from taking a position inconsistent with one taken previously when circumstances render the assertion of the second position unconscionable").

COMPTON, Justice, concurring.

I am unpersuaded that the superior court erred in granting summary judgment to the Burnetts. Thus, in my view, this court's affirmance of the superior court's decision is correct. While I concur in the affirmance, the reason for this result is that we are evenly divided in opinion on the merits of the issues presented to us.

It is a "sound, reasonable and necessary" rule that an affirmance by an evenly divided court is not precedent. *Taylor Constr. Servs., Inc., v. URS Co.,* 758 P.2d 99, 103 (Alaska 1988) (Compton, J., *dissenting*). Stating personal opinions for affirmance or reversal of the superior court's judgment is at best advisory, at worst confusing and misleading. Individual justices' opinions are simply immaterial. As Chief Justice Marshall wrote in *Etting v. Bank of United States,* 24 U.S. 59, 78, 11 Wheat. 59, 78, 6 L.Ed. 419, 423 (1826):

1. *See* Paul D. Carrington, et al., *Justice on Appeal* 31–43 (1976) (the integrity of the appellate process requires that appellate courts state the reasons for their decisions).

2. Of particular consequence is the fact that the City Council voted unanimously to guarantee

the Burnetts a right of access to their property either by preserving the Candlelight Extension or by constructing an alternate route. The council took this action after being fully apprised by its attorney of the legal complexities of the case.

In the very elaborate arguments which have been made at the bar, several cases have been cited which have been attentively considered. No attempt will be made to analyze them, or to decide on their application to the case before us, because the judges are divided respecting it. Consequently the principles of law which have been argued cannot be settled; but the judgment is affirmed, the court being divided in opinion upon it.

Therefore, I decline to accept the invitation to express my personal analysis and opinion on the merits of the underlying controversy.

RABINOWITZ, Chief Justice, dissenting in part.

I dissent from this court's affirmance of the superior court's ruling on summary judgment that the Burnetts owned a property interest in Candlelight Extension.

The Burnetts took the position in their summary judgment motion that the National Park Service delegated its authority to approve the easement to the State, and that the State approved the easement in April 1984. They further maintained that no other conditions were imposed by the express language of the ordinance, and that they therefore obtained a vested property interest in the road as soon as the State related its approval. At one time, the City more or less shared the Burnetts' view that the State possessed authority to approve the easement, and had approved the easement. The City now argues that the Burnetts never obtained federal approval, and that the easement never came into existence.

The documents submitted in support of the Burnetts' summary judgment motion indicate that City officials attempted to obtain federal approval for the easement through the Alaska Department of Natural Resources, Division of Parks. The documents also indicate that State officials informed the City that federal authority to grant approval had been delegated to the State Parks Division and that the Division granted approval. However, I find nothing in the record to conclusively establish either that the federal government granted approval or that it had actually delegated its authority to grant approval to the State.

Mere assertions of authority are insufficient to prevail on a motion for partial summary judgment. *See generally Zeman v. Lufthansa German Airlines*, 699 P.2d 1274, 1280 (Alaska 1985) (when reviewing a grant of summary judgment, this court draws all reasonable inferences of fact in favor of the non-moving party and against the moving party). At a minimum, I would require a Department of the Interior document approving the easement or delegating to the State authority to approve the easement. Without such a document in the record, I conclude that a material issue of fact exists as to whether the ordinance effectively granted the Burnetts an easement over Candlelight Extension. I would therefore reverse the grant of partial summary judgment and remand the case for further proceedings. *See Foster v. Hanni*, 841 P.2d 164, 170 (Alaska 1992) (we will reverse an order granting summary judgment "if the pleadings and evidence presented reveal either the existence of any genuine issues of material fact or that the moving party is not entitled to judgment as a matter of law").

If, upon remand, the Burnetts were to establish that the federal government either approved the easement or delegated the State authority to approve the easement, I would hold that the City is estopped as a matter of law from denying the validity of the easement.